## RAY & WHITNEY

### *v.*

## THOMAS MACKIN.

*Filed at Ottawa September 26, 1881.*

CONTRACT—*against public policy—fraud.* The property owners along a certain street in the city of Chicago having in contemplation the paving of the street, were negotiating with a paving contractor on that subject, and some of the owners had signed a contract with such contractor for the doing of the work. Pending these negotiations a second and rival paving contractor sought to obtain the contract for himself, soliciting the owners for that purpose. Finally the rival contractors compromised their respective interests in the matter, by the withdrawal of the one first mentioned, and the agreement on his part to aid in securing the contract for his rival, the latter agreeing to pay to the former a certain sum out of the profits expected to be realized for the work. This arrangement was consummated to the extent that the one who was to have the contract under the arrangement between the two rival contractors, did secure it from the property owners. That was brought about in this way: the contractor who withdrew from the contest to obtain the contract for the doing of the work, urged those of the owners who had signed the agreement with him to transfer their names to the other contract, and at a meeting of a committee of the property owners to consider and determine upon the matter, he wrote out a bid for the work for himself, and a lower bid for the other contractor, according to the arrangement beforehand. In an action to recover upon the agreement made by the contractor who secured the contract to do the work, to pay to the other a certain sum out of the profits of the job, it was *held*, that the agreement sued upon, taken in connection with its consideration, was against public policy, and a fraud upon the persons who were to pay for the improvement of the street, and therefore formed no valid foundation for the action.

WRIT OF ERROR to the Appellate Court for the First District; —heard in that court on error to the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was an action of assumpsit, brought in the Superior Court of Cook county, by Charles E. Ray and William C. Whitney, against Thomas Mackin.

The contract specially sued upon was as follows:

"CHICAGO, *Feb. 12, 1876.*

"I hereby agree to pay Ray & Whitney fifteen hundred (1,500) dollars out of the profits of walling, filling and paving Archer avenue, from Halsted street to the bridge over the south branch of the South Branch of the Chicago river, under a private contract made with the property owners on the said avenue, they agreeing to assist me in obtaining the work, to the best of their ability. The money to be paid to Ray & Whitney from time to time, as the profits on the work is collected.

THOS. MACKIN."

Under the plea of the general issue, the cause was tried before the court without a jury.

Upon the trial, the plaintiffs gave in evidence the written contract above mentioned, and then introduced as a witness *Charles E. Ray,* who testified as follows: "I am one of the plaintiffs in this suit, and know the defendant. My business is that of a paving contractor, and I have been in that business for thirteen years. The defendant is also a contractor, and he and I were both in that business at the time, and prior to the time, the south part of Archer avenue was paved; and in February, 1876, defendant did the work of walling, paving and filling Archer avenue, referred to in contract in evidence. I assisted him in obtaining it, by going to parties who had signed a contract with plaintiffs to have this work done, and getting them to transfer their names from our contract to his. Such contracts are generally obtained by a

contractor going on the street, seeing the property owners, and trying to get them to sign a contract for paving the street or improving the street in front of their property, at a stipulated price. I went with Mr. Mackin one day to see parties on that street. I saw a great many of them who had signed our contract, and got them to transfer their names from our contract to this,—told them that Mr. Mackin would probably get the street, and that they had better sign his contract. In that way I assisted him to obtain the contract. I had already agreed to give him up our contract and withdraw from the street. He never called on us for any further assistance in the matter. He got the contract to do this work afterwards. I have had conversations with Mr. Mackin since the completion of the work, and he has told me repeatedly that he had not collected all his money on that street. He has promised a great many times to pay the sum of money specified in the contract sued on. The contract given to Mr. Mackin for this work specified a fair and reasonable price for doing that work. The contract price for this work was somewhere about $130,000, I should judge, and the cost would be probably somewhere in the neighborhood of $100,000. I am, to some extent, acquainted with the pecuniary responsibility of these parties signing this contract. My impression is that they are all able to pay, with the exception of a very few; may be that half a dozen failed to pay, or could not pay, and probably half a dozen did not pay. Mr. Mackin had promised to pay this money. I had my first talk with him on the subject, say a year after the work was done, and my last talk with him about two weeks or so before the suit was commenced. He then would not say when he would pay, and I never got any satisfaction whatever, and I told him there was only one course left, and that was to sue him. He had told me a great many times that he would pay at some time, but he never set any time. I assisted Mr. Mackin to the best of my ability and to the extent of his asking, to

get this work. The principal assistance that he required was my giving up the contract and stopping work on the street. I went with him and got parties who had signed my contract, so far as we could find them, and got them to transfer their names."

*Cross-examination:* "My full name is Charles E. Ray, and my firm name is Ray & Whitney. That firm has been in existence since some time in June, 1870, I think. The business of our firm has always been contracting. The contract in suit was drawn at the time it is dated, at our office at Twelfth street bridge, and was then and there executed. It is in my handwriting, as is also the contract I have in my hand. I had a contract with the property owners. I had been working at it nearly a year. It was a contract for the improvement of that same street. This is the contract (referring to paper) that I had with property owners, and which I gave to Mr. Mackin at the time that I withdrew from this street—at the time that I made the arrangement with him that I would get off the street and give him a chance to go on and get it. I acted in behalf of the firm in its negotiations with Mr. Mackin. I represented our firm throughout in the negotiations with him, and myself went upon the road with him. By way of inducing the property owners to assist Mackin, I told them that I had withdrawn from the street, and that he was going on to get the contract to pave it, and I asked those parties who had signed this contract to transfer their names from it to Mr. Mackin's contract. That was my agreement with Mr. Mackin, that I should go with him and see those parties, as far as we could find them. Mr. Mackin, on consideration of my giving him this contract, and going with him and finding the parties who had signed this contract, and getting them to transfer their names from this contract to his, as far as we could find them, was what he expected of me when he gave me that contract. That was the understanding, and so far as I was required I carried it out."

Question—"As you did, and what you have done, you say was what you agreed to do?"

Answer—"Yes, sir; as far as I know. He never has found any fault with it that I know of. I did not inform the property owners whom I approached in Mr. Mackin's behalf, that I was to be paid by him for the services I rendered. I do not know whether they so understood or not. This contract of Mr. Mackin's was executed on the 12th of February, in pursuance of an agreement previously entered into between us. Our negotiations on the subject probably extended over a period of two or three days. I had the influence with the property owners on this street of having gone over it and worked it up pretty thoroughly, and got a large number of signatures to our contract. I rendered this assistance to Mr. Mackin with a view of enabling him to get the requisite number of signatures for obtaining a private contract, and I wanted to obtain seven-eighths of the signatures of the property owners. I think that was the ordinance at that time. There was nothing said about me obtaining the award of the contract for paving the intersections of the streets. I had no authority over the intersections at all; I had nothing to do with them; I had no interest in that. At that time, whoever obtained a street under a private contract, always obtained the intersections, though from the city. It was not necessarily with a view of enabling Mr. Mackin to obtain a contract for the intersections, although receiving such a contract from the city would necessarily follow his getting the private contract. I don't think that entered into the conversation at all, nor was there anything understood about it. It followed along as a matter of course. I was present at a meeting of property owners upon Archer avenue for the discussion of the plans and terms of doing the work of improvement, and Mr. Mackin was also there. The subject of paving the street was gone over with. There were a good many on the street did not want it paved, and a good many more that did.

The plans and character of the work were discussed to some extent, and after a while the meeting decided to give the work to Mr. Mackin. I do not recollect that at that meeting the respective plans were discussed, and that the meeting adopted the plans which Mr. Mackin advocated, and rejected the one which I advocated; I don't think they did. A committee was appointed by the meeting, by whose action they were to be guided. This committee received bids for doing the work on Archer road, and Mr. Mackin's bid was accepted. I also put in a bid for our firm. I think this meeting was on the evening of the 12th of February, but do not remember exactly. I think it was the evening of the day Mr. Mackin made that contract with us. It was after this agreement I put in a bid for doing the work according to the plans which the property owners had adopted. It was higher than Mr. Mackin's bid; we both bid on the same kind of pavement. I wrote Mr. Mackin's bid for him, and I put in a bid to the committee at a higher figure in our name. I had a good number of signatures of property owners, and turned over our contract with them to Mackin. * * * I did not discourage property owners from letting Mackin the contract, and never advised any one that the work could be done cheaper. It was understood beforehand between Mackin and me, that the two bids were to be put in, and that ours was to be higher than Mackin's. We had then made the agreement that I should transfer all the interest I had to him."

*Re-direct:* "Turner and Finucan were on the committee of property owners. I don't hardly think this committee knew anything about the arrangement between Mr. Mackin and myself. I could not say how many were present at the meeting of property owners; there were a good many there. One wanted the work done, and another didn't want it done. There was a great deal said *pro* and *con*, but the committee passed a resolution to accept Mr. Mackin's bid. There was another bid made there besides Mackin's and ours; it was

somewhat lower than Mackin's. The Bridgeport people did not know that party, and did not consider the bid at all. Mr. Turner was exceedingly anxious to have the street paved. He knew that unless I got off the street, the way things were fixed on the street it would not be paved then, and he counseled with Mr. Mackin and myself to get together and see if we could not make some arrangement, and Mr. Mackin to pay me for the time I was upon the street, and by that means get the street paved. I think I had a similar conversation with Mr. Finucan, but would not be certain. I know he was very anxious to have the street paved. When I delivered our contract with the property owners to Mr. Mackin, it was accompanied by the specifications which should be with all contracts."

This was all the evidence given on the trial bearing upon the question of the character of the contract sued upon, and its consideration.

The trial court found for the defendant, and entered judgment accordingly. The plaintiffs thereupon appealed to the Appellate Court for the First District, where the judgment was affirmed. This writ of error is sued out to the Appellate Court to bring in review that decision.

The question arising in the case is in respect to the character of the contract, taken in connection with the consideration upon which it was based, as being against public policy, and in fraud of the persons who were to pay for the improvement of the street.

Messrs. TENNEY, FLOWER & CRATTY, for the plaintiffs in error, argued in favor of the validity of the contract, insisting this was not a case of preventing competition at a public bidding, for a dishonest purpose, citing *Phippen* v. *Stickney*, 3 Metc. 384.

And that "by-bidding" does not avoid a sale at auction. *Latham's Exrs.* v. *Morrow,* 6 B. Mon. 630; *Reynolds* v.

*Dechaums,* 24 Texas, 174; *Steele* v. *Ellmaker,* 11 Serg. & R. 86; *Smith* v. *Clarke,* 12 Ves. 481.

Counsel urged that there was an important consideration not to be lost sight of: That when a sale is made at auction, a valid, binding contract is entered into; but when plaintiffs put in their "by-bid," if it should be so considered, it was not intended or expected that any such contract would then be made. And the fact that a bid lower than either plaintiffs' or defendant's was ignored, shows conclusively that the property owners did not intend or expect to bind themselves to let the work to the lowest bidder; citing *Marsh* v. *Russell,* 66 N. Y. 288, and *People, etc.* v. *Stephens,* 71 N. Y. 612.

Mr. ROBERT HERVEY, for the defendant in error, contended the contract was against public policy, and void, as being in fraud of the rights of those to be affected by the fraudulent combination of the plaintiffs and the defendant.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

The contract relied upon by plaintiffs, taken in connection with its consideration, was clearly against public policy, and a fraud upon the persons who were to pay for the improvement of the street. The circuit court was right in holding that the same formed no valid foundation for the action, and the judgment of the Appellate Court in the case is therefore affirmed.

*Judgment affirmed.*