**PREMIER ELECTRICAL CONSTRUC-
TION COMPANY, Plaintiff,**

v.

**MILLER-DAVIS COMPANY, Defendant.**

No. 66 C 1850.

United States District Court
N. D. Illinois, E. D.

Sept. 23, 1968.

A. Denison Weaver, Chicago, Ill., for plaintiff.

Owen Rall, Peter M. Sfikas, Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., for defendant.

### DECISION ON THE MERITS

ROBSON, District Judge.

This is a diversity action for an alleged breach of an oral contract. This court concludes, after a trial on the merits, that judgment should be rendered for the defendant.

On February 3, 1966, the Atomic Energy Commission (A.E.C.) invited several general contractors, including the defendant to bid on a project at the Argonne National Laboratories in Argonne, Illinois.[1] The bids were to be opened at 2:00 p. m. on March 3, 1966. The defendant, in turn, sent out invitations to several electrical subcontractors, including the plaintiff, to bid on the electrical work, which constituted approximately one-third of the entire project. The bid was divided into a base bid, which was of primary importance, and nine alternates.[2] Daniel J. Casey, of the A.E.C., testified that this form of bid was chosen to allow them to come within their budget. The A.E.C. did not meet its budget when the project was first bid in September, 1965, and because of this lack of funds, the project was not then begun. At the time of this earlier bid, the defendant was the low bidder and, had the project gone through, would have most likely been awarded the contract.

On March 2, 1966, the day before the bids were due, the plaintiff called the defendant, and made it very clear that it wanted to work on the job with the defendant. At that time, plaintiff's Contract Manager and Vice President, Stanley Wielgos, requested some assurance that the defendant would work with them, if the plaintiff helped by being the most competitive electrical subcontractor. The defendant, through Paul Hunsberger, then Chief Estimator of the Chicago office and Assistant Division Manager for defendant, gave no assurances. He told Wielgos to call around 12:30 the next day, March 3. Wielgos gave Hunsberger a base bid of $450,000 to $500,000 during this conversation. No figures were given for any of the alternates.

Wielgos called Hunsberger the next day at the designated time of 12:30. Wielgos gave Hunsberger a bid of

1. Meson Building Addition, ZGS, FY–65. This project was what is known as a "public contract." Defendant's Exhibit (DX) 17.

2. These were less important because several involved mostly material costs and little labor.

$494,800 and asked him whether he thought this bid was a good one. Hunsberger indicated that he thought the bid was all right, but that he would like to know what the alternate bids were. When Wielgos told him that this bid *did* include the alternates,[3] Hunsberger made it clear that he thought the bid was "very interesting." Wielgos then said: "Do we have a job if you have one?" Hunsberger responded, "If it goes in now, you have a job." Hunsberger then intimated that he would like some "sizeable protection" on the plaintiff's price. Wielgos offered to give him a sizeable protection and asked him in what area. Hunsberger then made some reference to the fact that he only had two bids in as of that time, both of which were high, and he expected about three more. Wielgos apparently understood what was desired,[4] and said that "we are banking on you getting the job and we are willing to gamble on you and you only." Hunsberger suggested that Wielgos call back at about 1:00 or 1:30 p. m. to check with him.

At about 1:00 o'clock, Wielgos called again and asked if his bid was holding up. Hunsberger said it was. Wielgos then repeated what he had said earlier about plaintiff still having the job. Hunsberger replied that "as it stands now, you do." Wielgos called again at 1:30, and a few minutes later, close to 1:40, and wanted to know what the situation was, because if their bid was not the lowest, they wanted to publish their price to the other contractors bidding on the job. Apparently, Hunsberger responded in a similar manner, and indicated that plaintiff's bid was still the lowest, and that if it remained that way, the plaintiff had the job. All these con-

versations were very short. Wielgos did not call again before 2:00 p. m.

Earlier, the defendant had sent one of its job superintendents, Richard Larsen, to Argonne with the official bid form, so that he would be able to insert any late changes onto the form. Plaintiff's Exhibit (PX) 6–O. At around 1:30, after getting lost, Larsen called his office from an open pay telephone. He talked to Hunsberger, or to William Sinclair, Vice President and Chicago Division Manager for the defendant. At the time of this first call, Larsen was given the nine alternates [5] to write down on the bid form. Larsen went to a more private telephone in an enclosed office and reached Sinclair again at around 1:40 or 1:45 p. m. Larsen was held on the line, and at about 1:50 p. m., Sinclair gave him the base bid of $1,019,000. Larsen remembered the times clearly because this had been "the only bid [he] ever took in [his] life."

At around 1:40 p. m., Hunsberger had given Sinclair the cost figures ($225,000) of another electrical subcontractor, St. Arnaud Electrical Company. Sinclair then called Joe Abrams, Electrical Engineer for St. Arnaud, and asked if they would take the job for $255,000. Abrams called back at around 1:45 or 1:50 p. m. and said "O.K." (See notation in Sinclair's handwriting on PX 6–M) Sinclair then made the necessary changes on the late change sheet (PX 6–D–1), and incorporated this altered electrical base bid into the general base bid. The resultant figure of $1,019,000 was given to Larsen at around 1:50 p. m. Larsen wrote it down and submitted the bid form to the A.E.C. about two or three minutes later.[6]

---

3. The bid was as follows: Base bid $274,100; Alt. 1 (no electrical work); Alt. 2, $1500; Alt. 3, $1400; Alt. 4, $4600; Alt. 5, $14,000; Alt. 6, $121,000; Alt. 7, $73,000; Alt. 8, $4200; Alt. 9, $900.

4. The "protection" desired was that plaintiff would submit higher bids to defendant's competitors so that defendant would have the lowest electrical costs.

This almost insured that it would be the lowest bidder on the prime contract, since there was a substantial (about $200,000) difference between plaintiff's and the others' bids for the electrical work.

5. These figures included those that the plaintiff had submitted for the alternates.

6. This court has, therefore, found that the final figure incorporated the St.

At the pre-award meeting on March 8, 1966, after the defendant was tentatively chosen as the lowest bidder, the A.E.C. had only to decide that the defendant was financially responsible before they would award them the contract. The A.E.C. told Sinclair that Alternates 4, 6 and 7 were chosen, with options on Alternates 1 and 9. (Alternate 9 was ultimately chosen by the time the contract was signed.) During this meeting, Sinclair told Casey (of the A.E.C.) that St. Arnaud would be used as the electrical subcontractor.[7] The A.E.C. was satisfied with the defendant's qualifications, and, on March 11, 1966, signed the contract with them.

At around 5:00 or 5:30 p. m. on the day the bids were submitted (March 3), Wielgos called Hunsberger to find out whether plaintiff's figures had been used in defendant's bid. Although the record is not clear on this point, Hunsberger apparently knew at this time that St. Arnaud would be used. However, Hunsberger said to Wielgos that he did not have the file in front of him and that he would have to check the file before he could tell. This conversation was very short, since Hunsberger made it clear that he was tired from the hectic bid day.

Wielgos called again the next morning, March 4, to get an answer to his question. Hunsberger told Wielgos that he was not going to divulge any information until he found out whether the defendant got the contract. Hunsberger definitely knew at this time that St. Arnaud was to be the electrical subcontractor, if the defendant was awarded the prime contract. He explained his reluctance to tell Wielgos anything by referring, in his testimony, to what had happened when this job has been bid the first time in September, 1965. Then, Hunsberger had told Divane Electric Company that they "had the job" five minutes prior to the time the bids were to be opened by the A.E.C. Hunsberger had received many angry calls from other electrical contractors after word got out that he had told Divane. He decided that the best course was to say nothing until the A.E.C. made a public announcement.

Many cross words were spoken by Wielgos during this conversation. He accused Hunsberger of trying to get out of their "bargain." Hunsberger replied that he was not trying to weasel out of "any bargain," but that he just could not say anything right then. Wielgos inquired of him whether, in the 12:30 and subsequent calls, there was an "agreement" that the plaintiff would "protect" the defendant in return for the defendant giving the plaintiff the electrical subcontract, if the defendant got the prime contract. Hunsberger agreed that he had said something to that effect, and further agreed that there had been an "agreement." Hunsberger, however, denied that he had accepted the plaintiff's bid with the assurance that he would let plaintiff know if there was a lower bid after 1:30 p. m. on March 3, 1966.[8] Wielgos was apparently unhappy

Arnaud bid, which was received by the defendant before 2:00 p. m. The plaintiff's suggestion that the underlying working papers were "doctored" later on to reach this figure has not been accepted by this court.

7. This information can be provided prior to bid opening time by answering Question 11 on the Bidder's Qualification Questionnaire, which asks the general contractor to list the subcontractors it plans on using if it gets the contract. However, there does not have to be an answer to this question, since Casey made it clear that he had the power to waive the answer, although nothing was

put in writing in this particular case. In addition, it had been customary over the eight or nine years that defendant had worked with Argonne for the defendant to leave Question 11 blank. Sinclair also testified that the defendant does not "know too much in advance who" the subcontractors will be. This testimony remained uncontradicted by the plaintiff.

8. This court agrees that not only was there no explicit promise made by Hunsberger to call the plaintiff should the defendant receive a lower bid, but that the facts and circumstances in this case negate any inference that this might

with this turn of events (even though he was not expressly told that his bid had not been used), and said to Hunsberger that he "might as well pull out of the thing then." Hunsberger was sympathetic and said:

"If you want to, that's your privilege,[9] but I can't tell you anything, Stan. This isn't my desire, either. I mean—don't misunderstand. I'm not saying that Bill [Sinclair] told me not to say anything. What I am saying is that conditions in this case have gotten such that I can't say anything."

The plaintiff contends that the defendant through Paul Hunsberger entered into a binding contract to employ the plaintiff as its electrical subcontractor, in consideration for the plaintiff giving the defendant "protection" by submitting higher bids to the other general contractors. The defendant contends that (1) there was no contract; and (2) if there was a contract, the consideration was illegal and against public policy, thereby making the contract unenforceable.

■ This court does find that there was an informal oral "agreement" between the parties. The defendant did agree that (1) if the plaintiff did submit higher bids to defendant's competitors, and (2) if the plaintiff was the lowest bidder, and (3) if the defendant used plaintiff's bid in preparing its prime bid, then (4) the plaintiff would get the electrical subcontract. It is clear that plaintiff did submit higher bids to the defendant's competitors, and it is equally clear that the plaintiff did not get the subcontract. The defendant used plaintiff's figures in preparing its bids on the alternates, and were it not for St. Arnaud's bid, the defendant would have used plaintiff's base bid. This would

mean that, outside of St. Arnaud's bid, the plaintiff was the lowest bidder. Taking St. Arnaud out of the picture for a moment, it appears that all the terms of the "agreement" were fulfilled on the plaintiff's part, and that the defendant did not uphold its part of this "agreement." To find out how St. Arnaud came on the scene, this court must look at another part of this oral "agreement."

■ During the course of the 12:30 p. m. call, the record is undisputed that Hunsberger told Wielgos: "I am not going to tell anybody else what your number [bid] is. What more can I tell you?" It is also undisputed that the defendant had only worked with the plaintiff on one "insignificant" job about six years before, and that within that same period of time, the defendant had worked with St. Arnaud about 20 to 30 times and "knew St. Arnaud pretty good." Given Hunsberger's surprised reaction to the plaintiff's bid, which was about $200,000 lower than the other electrical subcontractors, plus the defendant's greater familiarity with St. Arnaud, and given the fact that Sinclair admitted that he suggested to St. Arnaud a price of $255,000, PX 6–U–1, the inference is almost inescapable that either Hunsberger told St. Arnaud, or Hunsberger told Sinclair who then told St. Arnaud, what the plaintiff's "number" was, and asked St. Arnaud if they could meet it. In any event, it is clear that had the defendant not disclosed the plaintiff's bid to St. Arnaud, the plaintiff would have fulfilled all the terms of the "agreement." This court is of the opinion that the defendant is estopped by its conduct from arguing that the plaintiff did not fulfill the precise terms of the "agreement." I.L.P., Estoppel § 22; Sly v. United States of America, 220 F.2d

---

have been part of the "agreement." The plaintiff wanted the job very badly, was willing to gamble on the defendant alone, and had initiated all the calls up to 1:40 p. m. In addition, the plaintiff had been receiving calls all morning, and had ample reason to believe that other electrical bids might come in very close to the 2:00 p. m. deadline.

9. There was testimony, uncontradicted by the plaintiff, that although the defendant was bound in its bid with the A.E.C. that subcontractors like the plaintiff were not bound by the bid they submit to the general contractor, and that subcontractors "frequently" pull out before a written contract is negotiated.

212, 214–215 (7th Cir. 1955). This conclusion does not close the case, however.

 Although there was an "agreement" as outlined above, this does not necessarily mean that there was a "contract." Cf. Restatement, Contracts, Section 3 (1932), with Section 1. There must be an offer, an acceptance, and consideration to support the formation of a legally enforceable agreement, i. e., a contract. The offer, in order to be legally operative and to create a power of acceptance must contain all the terms of the contract to be made. 1 Corbin, Contracts, Section 11 (1950). These terms must be "reasonably certain" and reasonably ascertainable from the acts and words of the parties. Mitchell Novelty Co. v. United Mfg. Co., 94 F.Supp. 612, 613 (N.D.Ill.1950); Royall v. Chicago Streamlite Corp., 178 F.2d 81, 83 (7th Cir. 1949); Restatement, Contracts § 32 (1932). This court is of the opinion that the facts in this case do not support plaintiff's claim that a contract was entered into.[10]

 The mere fact that defendant used the plaintiff's bid in its prime bid does not in itself create an obligation on the defendant to give the plaintiff the subcontract. Merritt-Chapman and Scott Corp. v. Gunderson Bros. Engineering Corp., 305 F.2d 659, 662–663 (9th Cir. 1962). In that case, the general contractor requested the subcontractor to bid on certain parts of a dam project. The subcontractor gave the general contractor a written bid. The general contractor not only used the subcontractor's estimates in its prime bid, but it also listed the subcontractor as the sole supplier of all the equipment needed on the parts of the job related to the subcontractor's bid. Before the job was awarded, the general contractor told the subcontractor that it had used the subcontractor's bid in compiling its prime bid. Also, before the prime contract was awarded, the general contractor had several discussions with the subcontractor regarding the scope of the work. During these discussions, the general contractor told the subcontractor that "it looks like you people have the job." The general contractor also advised the subcontractor that purchase orders for steel would issue from the general contractor's offices. The general contractor learned shortly after this that it had been awarded the prime contract. More discussions were held, and the general contractor finally decided to give the work to another subcontractor. After a jury verdict for the original subcontractor, the Court of Appeals reversed and entered judgment for the general contractor. The court said, at 664:

> " * * * A promise to contract, or a promise to place an order in the future, is certainly nothing more than negotiation. * * *
>
> * * * * * *
>
> "This case bristles with indicia of negotiation. * * * MCS [the general contractor] certainly manifested an intention to enter into a contract with Gunderson [the subcontractor] at some time in the future, and MCS may very well have taken advantage of Gunderson, but contract with Gunderson it did not."

The instant case does not go as far as the parties went in the *Merritt* case, supra. There was no written bid; no listing of the plaintiff on the bid form, and no chance for further negotiations as to the scope of the work.

Since it was clear that the parties intended later to enter into a written con-

---

10. This court concludes that Hunsberger had the actual, or at the very least, the apparent authority to make commitments to subcontractors as to whether they had a particular job or not. Although he had no authority to "sign" the final contract with the subcontractor, he did have the authority to promise a subcontractor that it would have the job, leaving the formal arrangements to his superiors. This is shown by his conduct in this case, and by his notations on the Divane bid sheet, PX 6–U–1. There was also testimony that either Hunsberger or Sinclair could give the "O.K." to a subcontractor. Cf. Williams v. Favret, 161 F.2d 822, 823 n. 2 (5th Cir. 1947).

tract, the statement in Plumbing Shop, Inc. v. Pitts, 67 Wash.2d 514, 408 P.2d 382, 385–386 (1965), is especially appropriate and persuasive. In that case, after the general contractor obtained the prime contract, it asked the subcontractor to prepare a cost breakdown, which was prepared and turned over to the general contractor. Shortly thereafter, the general contractor refused to enter into a written contract. The subcontractor claimed that a contract existed. The court disagreed and found in favor of the general contractor. Near the end of its opinion, the court said, at 385:

> " * * * Any prudent *general contractor*, with the attendant responsibility for co-ordinating all aspects of a project in order to meet the quality and time requirements of the general contract, probably would require a substantial degree of specificity with respect to time of completion of various portions of the mechanical [or electrical] work in order to insure the overall progress of the project. For that matter, good business practice would dictate that prudent subcontractors (whatever their undertaking) should insist upon precise terms indicating the determinants of, and time for, progress payments and the time for completion of various portions of their undertakings.
>
> "By the plaintiff's own admission, he and the defendant contemplated embodying their mutual obligations or legal relationship in a written agreement with respect to the entire undertaking. * * * In the absence of agreement to essential terms, such as bonding, penalty provisions, manner of payment, and work progress completion dates, it can readily be seen that the plaintiff and the defendant must have intended to set out those particulars (and others) in the written contract which was to be executed at a later date."

The court made it clear that the only term agreed upon was the price, and that this was insufficient in law to create a contract between the parties. Id., at 386.

The case before this court has much the same difficulty: there was to be a later written contract and there actually were many matters that needed resolution before a final written contract would have been entered into. These additional matters included demolition, concrete work, excavation, special priorities for materials, safety, and special equipment. See also Williams v. Favret, 161 F.2d 822, 824 (5th Cir. 1947); O. C. Kinney, Inc. v. Paul Hardeman, Inc., 151 Colo. 571, 379 P.2d 628, 631 (1963); C. H. Leavell and Co. v. Grafe and Associates, Inc., 90 Idaho 502, 414 P.2d 873 (1966).

■■ The plaintiff contends that the case of Industrial Electric-Seattle, Inc. v. Bosko, 67 Wash.2d 783, 410 P.2d 10 (1966), modifies greatly the holdings of the *Merritt* and *Pitts* cases, supra. This court cannot agree. The *Bosko* case held admissible and of probative value, evidence of a custom and usage in the Washington community, that when a general contractor used the bid of a subcontractor, the general contractor was bound to use the services of that subcontractor, if its gets the prime contract. The court emphasized that this custom and usage only added to the parties' conduct and communications, and did not alone establish the existence of a contract. This case has no relevance here, since the plaintiff introduced no evidence of a similar custom and usage in any community, much less that of Illinois and its environs. Plaintiff might wish to argue that the conduct of the defendant with regard to its acceptance of the Divane Electric Company's bid in September, 1965 (PX 6–U–1), plus its conduct in this case, establishes such a custom. This position is refuted by one of plaintiff's own authorities, Traff v. Fabro, 337 Ill.App. 83, 84 N.E.2d 874 (1949). Although rejecting the use of custom in the case before it, that court outlined what were the requisites for establishing such usage:

> "A usage or custom to be binding must be so uniform, long-established, and generally acquiesced in, and so well-known, as to induce the belief that

the parties contracted with reference to it, nothing appearing in their contract to the contrary. * * *

"Proof of certain isolated instances is not sufficient to establish a usage or custom." Id., at 87–88, 84 N.E.2d at 877.

The plaintiff here has not met this burden of proof.

It is therefore the opinion of this court that, although there was an "agreement" between the parties, it did not rise to the level of a contract. But even if this court were to find that a contract did exist, the plaintiff could not recover, since the consideration that supported the offer and acceptance is illegal and renders the contract unenforceable.

■ The consideration that plaintiff offered was to "protect" the defendant by submitting higher electrical bids to the defendant's competitors. In this court's opinion, this was an agreement designed to stifle competition for public contracts, and, as such, violated public policy. 12 I.L.P., Contracts, § 174; Conway v. Garden City Paving & Post Co., 190 Ill. 89, 60 N.E. 82 (1901); Givins v. People ex rel. Raymond, 194 Ill. 150, 154, 62 N.E. 534 (1902); Ray & Whitney v. Mackin, 100 Ill. 246 (1881). In the Conway and Mackin cases, supra, the competition which was stifled resulted from a noncollusive agreement among direct rivals. The plaintiff argues that since direct rivals were not involved in this case, this is a sufficient distinction to take this case outside this statement of public policy. While it is true that this case does not fit the precise facts of those cases it only takes a small logical step to make this case fall within that general principle.

■ It is clear that the plaintiff's bid of $274,100 was substantially lower (more than $200,000) than the bids of the other electrical subcontractors, at least as of 12:30 p. m. on the bid day. The defendant knew this fact. The defendant also knew that if the plaintiff were to submit higher bids to its competitors, it would almost certainly get the prime contract because of this substantial difference. There is no question in this court's mind that if the plaintiff had been able to submit lower bids to the other contractors, competition would in all likelihood have been increased, and the defendant might not have obtained the prime contract. However, this court does not have to engage in such speculation as to what might actually have occurred. All this court has to find is that the agreement between the parties to this suit had a "tendency" to stifle competition. McMullen v. Hoffman, 174 U.S. 639, 647, 649, 19 S.Ct. 839, 43 L.Ed. 1117 (1899). As was said in Conway, supra, 190 Ill. at 94, 60 N.E. at 84:

"* * * [T]he test of illegality is not the result in a particular case, but the tendency of the contract if recognized as valid in the law."

This agreement clearly has a tendency to stifle competition. In Givins, supra, the court said that a bid on a public contract "may be rejected for the reason that it resulted from a combination between bidders, or from the act of the successful bidder to limit the number of bidders, or increase the contract price."

The plaintiff urges that the case of Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), allows the enforcement of the agreement in this case. Again, this court cannot agree with the plaintiff's argument. In Kelly, the court rejected the defense of illegality in an action under a contract which violated the Sherman Anti-Trust Act,[11] but pointed out that in a restricted class of cases the defense was a valid one. If the contract is of such a nature that a part of it constitutes an "intelligible economic transaction" in itself and the enforcement of that portion of the contract would not be to enforce a violation of the Act, then such portion of the contract will be enforced in order to avoid an inequitable

11. This court assumes, without deciding, as did the court in Kelly, supra, at 518 79 S.Ct. 429, that the allegations of

stifling competition duly charge a violation of the Sherman Act.

result. Tampa Electric Co. v. Nashville Coal Co., 276 F.2d 766, 773 (6th Cir. 1960). In the instant case, there is no part of the agreement which could be enforced as a separately "intelligible economic transaction."

The classic statement on the enforceability of illegal contracts is found in McMullen v. Hoffman, supra. There the Supreme Court said, 174 U.S. at 654, 663, 19 S.Ct. at 845, 848:

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. * * *

\* \* \* \* \* \*

" * * * 'You cannot enforce it directly; that is, by claiming damages or compensation for the breach of it, or contribution from the persons making the profits realized from it.' "

In dealing with the dilemma of allowing the defendant who participated in the illegal contract to raise the defense of illegality, the court said, at 669–670, 19 S.Ct. at 851:

" * * * The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defence is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

When illegality has been found to exist, as it has in this case, the courts will not allow damages to be recovered for an alleged breach of the illegal agreement. This court agrees with the court in *McMullen*, supra, that "the law will leave the parties as it finds them." Id., at 670, 19 S.Ct. at 851; National Transformer Corp. v. France Mfg. Co., 215 F.2d 343, 361 (6th Cir. 1954).

In view of this conclusion, the other issues raised by the defendant need not be discussed.

On the foregoing grounds, therefore, it is ordered that judgment be rendered for the defendant, without costs, and the cause be and it is hereby dismissed.