**CAISSON CORPORATION**

v.

**INGERSOLL–RAND COMPANY,**
**Appellant.**

**No. 79–1718.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1979.

Decided April 23, 1980.

---

**6.** *See* pages 671–672, *supra*.

K. Robert Conrad (argued), John A. Guernsey, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellant.

Tom P. Monteverde (argued), Monteverde & Hemphill, Philadelphia, Pa., for appellee.

Before ADAMS, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

This is an appeal from a judgment of $426,724.90 awarded to Caisson Corporation ("Caisson") as damages after an eight-day jury trial. Caisson brought this diversity action against Ingersoll-Rand Company ("Ingersoll-Rand"), the manufacturer of a DHD–130 "Superdrill", seeking consequential damages because the drill failed to perform as represented by Ingersoll-Rand. Caisson purchased the drill from Portable Tool Sales and Service Company, Inc. ("Portable Tool"), Ingersoll-Rand's distributor in the Chicago area, which was not a defendant in the action. On appeal, Ingersoll-Rand claims there was insufficient evidence to support the jury's finding that there was an express oral contract between it and Caisson, that the trial court committed errors by excluding evidence of the terms of Ingersoll-Rand's agreement with Portable Tool and in restricting its cross-examination of an expert witness, and that the court erred in refusing to grant it a new trial because Caisson failed to supply certain documents relating to the damage claim in response to its discovery requests. The claims will be considered seriatim.

### II.

*Existence of a Contract*

Caisson is a contractor specializing in the construction of caissons, which are concrete

columns similar to piles, used as foundations for large buildings and other structures. Ingersoll-Rand manufactures, among other things, rock-drilling equipment. In the early 1970's, it began manufacture of a line of "Superdrills," capable of drilling holes of twenty-four inch diameter in hard rock (the DHD–124), developed for use on the Alaskan Pipeline construction project. Its success with that model led it to market the Superdrills in three sizes, twenty, twenty-four, and thirty inch diameters.

Caisson first became interested in the Superdrills when its vice-president, Richard Lowe, saw a model of the DHD–124 being exhibited by Ingersoll-Rand personnel at a Chicago trade show in December, 1974. After the show, Lowe received a letter from Philip Taylor, Marketing Manager of the Downhole Drill Products Division of Ingersoll-Rand, expressing the company's confidence in the drill and the interest of Ingersoll-Rand personnel in meeting with Caisson to discuss operation and maintenance of the equipment. Taylor stated in the letter that "until we establish one year of operating time on the DHD–124, there is and will be an element of risk borne by both Ingersoll-Rand and *our customer*." (emphasis added).

In February, 1976, Caisson purchased a DHD–124 to drill 24 inch post holes to support a mountain road in Weirton, West Virginia. Before submitting Caisson's bid on this project, Lowe had several meetings with Taylor, in which they discussed such matters as the kinds of rock that would be encountered on the job and the support equipment that would be used. After learning it was the successful bidder, Caisson placed an order for a DHD–124. On Ingersoll-Rand's instructions, the order was issued to Portable Tool, Ingersoll-Rand's distributor in Chicago. Caisson had no pre-purchase discussions with any Portable Tool personnel. Caisson began work on the Weirton project in March of 1976, and was satisfied with the operation of the DHD–124.

At approximately the same time, Caisson considered bidding on a project in Mineral, Virginia, which required drilling 30 inch holes in solid rock for caissons to support a foundation for a nuclear power station being built for Virginia Electric Power Company (VEPCO). Lowe again had a series of discussions with Taylor, this time concerning the 30 inch Superdrill, the DHD–130. An Ingersoll-Rand engineer was present at some of the discussions. Ingersoll-Rand was familiar with the rock conditions at the VEPCO site, and Taylor advised Lowe about the hardness and drillability of the rock. Lowe and Taylor discussed the capabilities of the DHD–130. Lowe testified that Taylor told him that the 30 inch Superdrill was capable of drilling the hardest rock and would do the job at VEPCO. Lowe also testified that Caisson would not have submitted a bid on the VEPCO job or bought the DHD–130 without these representations.

The Superdrills weigh approximately five tons each. The weight of the drill provides the force needed to drill the holes in heavy rock. Lowe was interested in the drilling rate (footage per hour) and the life expectancy of a bit for the DHD–130. The bit is the part of the drill coming into contact with the rock. Taylor supplied Lowe with information concerning the drilling rate and the life expectancy of a bit. The cost of a bit was approximately $32,000. The cost of the entire Superdrill was approximately $150,000.

Caisson submitted a bid for the VEPCO project partly based on the information supplied by Taylor, and when Caisson was awarded the contract it purchased a DHD–130, issuing the order to Portable Tool, as instructed by Ingersoll-Rand. The invoice was an open invoice with no provision regarding any warranty and no limitation of liability.

The drill was sent to Caisson's yard in Northbrook, Illinois, was assembled there by an Ingersoll-Rand employee, and was sent to the VEPCO site. Ingersoll-Rand personnel were present when the equipment was set up and began operating there in July, 1976.

Caisson had difficulties with the drill from the beginning. First the pins which separated the drill bit from the rest of the drill broke repeatedly. When Ingersoll-Rand strengthened the pins, there was breakage of the shank, the part of the bit, considerably smaller in diameter than the bit face, which extends into the body of the drill. Dozens of pins and five or six shanks broke. Between July 9 and October 26, Ingersoll-Rand shipped replacement parts to Caisson with a retail value of almost $170,000, incurred shipping expenses of more than $5,000, and sent its personnel to the job site for 62 workdays. No invoices accompanied those shipments and services. Caisson dealt only with Ingersoll-Rand personnel concerning the breakdowns.

At this time, there were two other users of the DHD–130, and there was evidence that one of them also had problems with bit shank failure. Ingersoll-Rand decided to redesign the 30 inch bit by strengthening the shank. A report written later by Hughes, an Ingersoll-Rand engineer, to his superior indicated that "[t]he repeated shank-off failures of the initial design 30 inch diameter bits at the VEPCO site in Mineral, Virginia (Caisson Corp.) mandated a bit redesign."

On October 26, 1976 Caisson was left with no rock drilling equipment of its own because no bit shanks as originally designed were available, and the redesigned bits were not yet in production. Caisson encountered so much downtime (time lost on the job) that the VEPCO contractor threatened to remove Caisson from the job; to avoid this possibility, Caisson employed a competitor, New Jersey Drilling, but after several weeks, it too ran out of replacement parts for its equipment. Caisson rented other drilling equipment which was unsuccessful. From approximately November 18, when New Jersey Drilling left the site, to late December 1976, when Ingersoll-Rand provided Caisson with the redesigned bits which worked satisfactorily, Caisson had no effective rock drilling equipment.

In response to special interrogatories, the jury found that there was a contract between Ingersoll-Rand and Caisson Corporation, that Ingersoll-Rand made statements of fact about performance of the DHD–130 at the time it made the agreement with Caisson and the statements formed part of the basis of the bargain between the parties, that the drill did not conform to these statements of fact, that the original DHD–130 was not fit for the purposes for which such a product is used, that at the time of contracting Ingersoll-Rand knew of the particular purpose for which Caisson was purchasing the drill, that the drill was not fit for these particular purposes, and that the drill's lack of fitness for both its ordinary and Caisson's specific purposes was not the result of the manner in which Caisson used the drill.

Ingersoll-Rand claims that there was insufficient evidence of a contract between it and Caisson for the district court to have submitted the issue to the jury, and that it was entitled to a judgment notwithstanding the verdict. Ingersoll-Rand argues that the sale which was made from Portable Tool to Caisson cannot be transformed into a contract between it and Caisson. Both parties agree that Illinois law is applicable.

Caisson's theory was that it had an express oral contract with Ingersoll-Rand, a term of which was that if Caisson purchased the drill through a purchase order placed with Portable Tool, Ingersoll-Rand would stand behind the product. It contends this was supported by the fact that when, pursuant to that arrangement it did send its purchase order to Portable Tool, Portable Tool sent it an invoice which contained no limitation as to damages.

The jury's finding that there was an express contract between Caisson and Ingersoll-Rand is crucial to Caisson's recovery, because it is probably the only basis under Illinois law on which it could recover consequential damages for the economic loss it suffered on the VEPCO job as a result of failure of the drill to perform as represented.[1] The Appellate Court of Illinois has

---

1. Appellant has not raised on appeal whether consequential damages could appropriately have been awarded for breach of contract un-

der the circumstances of this case. See U.C.C. §§ 2–714 and 2–715.

recently had occasion to enunciate Illinois' position on the issue which has divided the courts as to whether an action may be maintained against a manufacturer for recovery of "economic losses". In *Alfred N. Koplin & Co. v. Chrysler Corp.*, 49 Ill. App.3d 194, 203–204, 7 Ill.Dec. 113, 120, 364 N.E.2d 100, 107 (2d Dist. 1977), it lined Illinois up with those cases limiting a manufacturer's liability for economic losses when the claim sounds in tort:

> We conclude, as did the court, without analysis, in [*Rhodes Pharmacal Co. v. Continental Can Co.*, 72 Ill.App.2d 362, 219 N.E.2d 726 (1st Dist. 1966)], that tort theory (there strict liability, here negligence) does not extend to permit recovery against a manufacturer for solely "economic losses" absent property damage or personal injury from the use of the product. Our decision herein is limited to those products liability cases which seek recovery solely for economic losses based upon negligence and strict liability theories. The province of contract law is that group of situations which involve the reasonably foreseeable commercial expectations of purchasers and sellers. . . . Inequalities in the bargaining position of purchasers of goods versus manufacturers of those goods will certainly arise. Nonetheless, as noted by the analysis of the California Supreme Court in *Seely v. White Motor Co.*, [63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1966)] the body of legal principles invoked in situations when "economic" loss is involved are those of contract law. . . . Contract and tort, however, remain distinct categories serving distinct needs in the rubric of our law. Our examination of this case indicates that there is no basis for plaintiff's recovery in contract theory and that recovery in negligence is not sustainable because merely "economic loss" is involved.

Although the *Koplin* case did not involve misrepresentation, that claim also sounds in tort, and it is likely that Caisson recognized that if it had proceeded on the misrepresentation theory suggested in its complaint, it might not have been able to recover the damages it claimed.

Another possible theory of recovery, under which Caisson would be considered the third party beneficiary of the contract between Ingersoll-Rand and its distributor, Portable Tool, also would have had a fatal flaw. Under the third party beneficiary theory Caisson would have been obliged to take the contract as the original parties made it, and would be bound by all its provisions. *L. B. Herbst Corp. v. Northern Illinois Corp.*, 99 Ill.App.2d 101, 105, 241 N.E.2d 125, 127 (2d Dist. 1968). Since the contract between Ingersoll-Rand and Portable Tool limited its liability to replacement of defective parts, Caisson again would have been unable to recover against Ingersoll-Rand for consequential damages.

Accordingly, Caisson's recovery of consequential damages, the only damages claimed, is dependent upon its theory that there was an express contract between it and Ingersoll-Rand. Neither party contends that Illinois law as to the existence of a contract is unique, and Illinois cases apply general principles of contract law. Ingersoll-Rand claims that there was no contract because there was absent in the discussions between it and Caisson any reference to price, other terms and conditions of sale, warranties, delivery requirements, and similar details. The Uniform Commercial Code, Section 2–204, adopted by Illinois, provides as follows:

> (Sec.) 2–204. *Formation in General.* (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have in-

tended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Ill.Rev.Stat. c. 26 § 2–204 (1977). Section 1–201(3) defines an agreement as:

[T]he bargain of the parties in fact as found in their language or by implication from other circumstances.

 While the absence of certain terms may, under certain circumstances, suggest the nonexistence of a contract, the fact that the arrangements may actually have been concluded can evidence the contrary. Thus, if there is an attempt to specifically enforce a contract in which certain essential elements are missing, the lack of specificity may make enforcement so difficult that the courts will hold there was no enforceable contract. Similarly, if there is an attempt to seek damages for an executory contract, the courts may focus on the absence of agreement to essential terms to denominate the arrangement between the parties as one of negotiation preliminary to an anticipated later written contract. *See, e. g. Premier Electrical Construction Co. v. Miller-Davis Company*, 291 F.Supp. 295, 300–301 (N.D.Ill.1968). On the other hand, when the parties have not only completed their arrangements but have actually completed the commercial relationship involved, notwithstanding the absence of definite written terms, a trier of fact is entitled to view the entire dealing and conclude that it indicated there was a contract with terms mutually understood between the parties. As noted in Corbin's treatise,

The court will be more ready to find that the apparently incomplete agreement was in fact complete . . . in case the parties have already rendered some substantial performance or have taken other material action in reliance upon their existing expressions of agreement. The fact that they have so acted is itself a circumstance bearing upon the question of completeness of their agreement.

1 A. Corbin, Contracts § 29 (1963) (footnote omitted).

The relevant Illinois principles were set forth in *Bailey v. Eater*, 53 Ill.App.2d 37, 42, 202 N.E.2d 656, 659 (5th Dist. 1964), where the court said:

One of the essential elements for the formation of a contract, other than a contract implied in law or quasi contract, is a manifestation of assent by the parties to the terms thereof. It is essential that both parties assent to the same thing in the same sense and that their minds meet on the essential terms and conditions.

In *Euclid Engineering Corp. v. Illinois Power Co.*, 79 Ill.App.2d 145, 152, 223 N.E.2d 409, 412 (4th Dist. 1967), the court stated that the Uniform Commercial Code has not made any change in the basic law. In fact, section 2–204 has been interpreted to have broadened the range of factors that may be considered in determining if the parties have actually reached an agreement. *Meister v. Arden-Mayfair, Inc.*, 276 Or. 517, 523–24, 555 P.2d 923, 926 (1976) (*en banc*). Even under pre-Code law, there was considerable latitude for the trier of fact, as noted in Corbin's treatise:

We must not jump too readily to the conclusion that a contract has not been made from the *fact of apparent incompleteness*. People do business in a very informal fashion, using abbreviated and elliptical language. A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact. . . . The parties may not give verbal expression to such vitally important matters as price, place and time of delivery, time of payment, amount of goods, and yet they may actually have agreed upon them. This may be shown by their antecedent expressions, their past action and custom, and other circumstances.

1 A. Corbin, Contracts § 29 (1963) (footnote omitted).

 Ingersoll-Rand does not question the correctness of the court's charge to the jury that:

A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

Thus, the jury was entitled to consider whether the course of dealing between Caisson and Ingersoll-Rand showed that they had in fact had a meeting of minds. The evidence disclosed that there were a number of discussions between Ingersoll-Rand and Caisson personnel concerning the purchases of the DHD–124 and the DHD–130, during which Ingersoll-Rand made several representations concerning the products; Ingersoll-Rand personnel assembled the DHD–130 for Caisson; Ingersoll-Rand employees monitored its operations; and Ingersoll-Rand responded to Caisson's problems by sending its personnel to the job site and replacing broken parts, with a retail value of almost $170,000, without charge. No Portable Tool representatives were present at the pre-purchase negotiations, and Portable Tool admittedly did not have the expertise to supply Caisson with the information it required.

■ The court must allow the jury's finding to stand whenever the evidence is "of such character that reasonable men, in an impartial exercise of their judgment may reach different conclusions." *Silverii v. Kramer*, 314 F.2d 407, 409 (3d Cir. 1963). We cannot substitute our opinion for the verdict returned by the jury. *Hodgson v. Lloyd Brasileiro Patrimonio Nacional*, 294 F.2d 32, 34 (3d Cir. 1961), *cert. denied*, 369 U.S. 848, 82 S.Ct. 931, 8 L.Ed.2d 8 (1962). As we noted in *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 758 (3d Cir. 1977), we must test defendant's motion for judgment notwithstanding verdict by "whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Construing the facts most favor-ably to Caisson, as we must, we cannot say on the face of this record that the trial court erred in holding that the jury was entitled to find that there was a contractual relationship between Caisson and Ingersoll-Rand.

### III.

#### Alleged Trial Errors

#### a. Evidence of Terms of Distributor Contract

■ Ingersoll-Rand concedes that its conduct could lead to the implication that there was a contract between it and Caisson but claims that the trial court erroneously excluded evidence which would have explained that conduct on some other basis. The evidence which Ingersoll-Rand attempted to introduce was the terms of its agreement with its distributor, Portable Tool, imposing on it the obligation to repair and replace defective equipment, which Ingersoll-Rand claims on appeal might have explained "why it behaved the way it did when problems occurred with the drill." The difficulty with Ingersoll-Rand's position is that it did not offer the distributor contract at trial for the purpose of disproving the existence of a contract with Caisson or explaining its actions.

Counsel for Ingersoll-Rand twice attempted to introduce into evidence the terms of this contract. Although the district court allowed the jury to know of the existence of a written contract between Ingersoll-Rand and its distributor Portable Tool, an objection was raised as to the relevance of the terms of the contract. Counsel for Ingersoll-Rand claimed the terms were relevant because under the applicable Illinois law, Caisson could only recover on a third-party beneficiary theory, under which Caisson would be limited by the contractual limitations on Ingersoll-Rand's liability under that contract.[2]

---

2. Counsel for Ingersoll-Rand's first attempt to introduce the contract was as follows:

 Q Now could you look over on the third page of this document under—
 MR. MONTEVERDE: This is exhibit what, please?

 MR. CONRAD: Exhibit D–66.
 MR. MONTEVERDE: Thank you.
 BY MR. CONRAD:
 Q Under IV, which is entitled "Guarantee and Liability" could you read that to us, please?

The contract was proffered only to show the disabilities that Caisson would be bound to as a third party beneficiary of the Ingersoll-Rand and Portable Tool contract, irrespective of Caisson's prior knowledge of the terms of that contract. As we noted before, and as the district court ruled, Caisson was not proceeding on the third-party beneficiary theory, but relied on the existence of a contract between it and Ingersoll-Rand. The court ruled that since Ingersoll-Rand had not established that Caisson knew of the contract's terms, it was irrelevant to the issue at trial.[3]

 We are confronted with a situation in which the district court made a correct ruling on the basis of the arguments raised by appellant's counsel at trial, but we are urged to reverse on the basis of another argument not raised before the trial court.

> MR. MONTEVERDE: Just a second, please.
>
> Again, Your Honor, I object on the ground of relevance.
>
> THE COURT: Well, if we are going to go through this it seems to me that first the matter of knowledge of this should be demonstrated. This agreement has no relevance in my view unless it can be demonstrated that there was knowledge of this agreement and this relationship on the part of the plaintiff.
>
> MR. MONTEVERDE: That is right.
>
> MR. CONRAD: The knowledge of it is—
>
> THE COURT: I would therefore suggest that that would be a foundation before you proved the terms of it.
>
> MR. CONRAD: If I understand the theory here, because in the pretrial memorandum which was filed with this Court, which was the first time we really had any notion clearly of what the plaintiff was claiming, there is a case cited which is an Illinois case and this Illinois case says that a remote purchaser may recover from a manufacturer under Illinois law which governs, not under 402(a), where there is economic injury, but only on the theory of third-party beneficiary. Now in citing this case I assume Mr. Monteverde is relying on its authority.
>
> MR. MONTEVERDE: No.
>
> MR. CONRAD: And that case also says, Your Honor, that—
>
> THE COURT: I really don't think all this legal discussion is appropriate at this point. It seems to me that the plaintiff is making his claim based on an express contract,—
>
> MR. MONTEVERDE: That is correct.

We generally refuse to consider issues that are raised for the first time on appeal, absent exceptional circumstances, *Newark Morning Ledger Co. v. United States*, 539 F.2d 929 (3d Cir. 1976), and have held on numerous occasions that a trial court should not be reversed on grounds that were never urged or argued in the court below. *See, e. g., Walker v. Sinclair Refining Co.*, 320 F.2d 302 (3d Cir. 1963) (*en banc*). The rationale for this approach was articulated in *Roberts v. United States*, 316 F.2d 489, 497 (3d Cir. 1963), where we said,

> If defendant had advised the court and opposing counsel of the reasons it advances at this time, the question might have been rephrased so as to remove any objection. A trial court should not be reversed on grounds other than those urged below. [citations omitted].

> THE COURT: —as he has stated here repeatedly, and therefore it is based upon the relationship and the dealings between plaintiff and Ingersoll-Rand.
>
> MR. MONTEVERDE: That is correct, Your Honor.
>
> THE COURT: With that in mind I am now going to rule that before any further evidence as to D–66 is admitted, knowledge of it, its contents, as to the plaintiff must first be shown.

The second effort to introduce the contract relied on the same basis:

> [THE COURT]: . . .
>
> Now would you tell me why you think your contractual relationship between your client and Portable Tool would be admissible in this claim of the plaintiff against your client, unless he had knowledge of what information it was?
>
> MR. CONRAD: Because under the Illinois cases which we cited to Your Honor, which applies to them, because Mr. Monteverde now concedes that the law of Illinois applies here, says that if a remote purchaser is to sue a manufacturer he takes through the chain of title with the disabilities that come with it including any disclaimers the manufacturer has made to the distributor. That is what the *Rhoades* case says.

3. In its brief, Caisson suggests that the distributorship agreement would have had no application to the present case in any event, since it pertained only to sales of specified products and the Superdrills were not so specified. This was not the basis of the trial court's ruling, and in light of our disposition of this appeal, we need not reach this issue.

This doctrine has been specifically applied in the case of evidence offered for one reason which might have been admissible for another. In *Independent Iron Workers, Inc. v. United States Steel Corp.*, 322 F.2d 656 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963), plaintiff unsuccessfully sought to introduce evidence at trial of events occurring after filing of the complaint as relevant to the issue of damages. On appeal it argued the evidence was admissible as events so related in character and time to the transaction in issue as to tend to show the existence of a plan or the character of that transaction. The Ninth Circuit refused to consider these grounds for admissibility, stating:

> On appeal plaintiff may not base error on the fact that evidence offered for one purpose and properly rejected by the trial court may have been admissible for another purpose for which it was not offered.

322 F.2d at 674.

Nor is Ingersoll-Rand in any better position because it suggested in its post-trial motion that "the agreement was necessary to understand the transaction between the parties." In *Belmont Industries, Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434 (3d Cir. 1975), the objection to evidence raised at trial was that the evidence was inadmissible hearsay. In its motion for a new trial, the plaintiff argued for the first time that the evidence also violated the best evidence rule. This court held that "a party may not seek a new trial on the basis of objections to evidence not brought to the court's attention at the original trial." *Id.* at 438. Similarly, in *Weaver v. Ford Motor Co.*, 382 F.Supp. 1068 (E.D.Pa.1974), *aff'd*, 515 F.2d 506, 507 (3d Cir. 1975), the district court denied a motion for a new trial, because a valid objection to the admission of testimony was not raised at trial but only when a motion for a new trial was made. *Accord, Connor v. Crescent Lighting Corp.*, 61 F.R.D. 62 (E.D.Pa.1973); *Green v. Philadelphia Gas Works*, 333 F.Supp. 1398 (E.D.Pa. 1971), *aff'd sub nom. Green v. Pavisi*, 478 F.2d 313 (3d Cir. 1973). Therefore, we reject Ingersoll-Rand's claim that the trial court's error in excluding the terms of the contract justifies a new trial.

#### b. *Cross-examination of Caisson's Expert Witness*

Ingersoll-Rand contends that the district court erred in restricting cross-examination of Caisson's expert witness. Richard Lowe, Caisson's Vice-President, who had practical experience in construction work and drilling and with both the DHD–124 and the DHD–130, gave his opinion that the shank failure resulted from a bending condition caused when the bit was rotated on uneven rock which in time caused the shank to crack. He testified that in his opinion the shank of the 30-inch drill, which had the same diameter as the shanks in the 20 and 24-inch drills, was not large enough in relationship to the diameter of the bit or to the size of the hole that it was designed to cut. He testified the pin failures were also related to the smaller diameter originally designed for the 30-inch drill. During cross-examination, counsel for Ingersoll-Rand attempted to question Lowe on technical matters such as the transmission of energy to the rock, and its relationship to the face of the bit. The court precluded this line of cross-examination, saying:

> THE COURT: I think it would be appropriate if I would suggest, counsel, that this witness has not been qualified as a physicist or a metallurgist. He was qualified to express opinions on the use of this bit because of his experience on the job in the field and not because of his technical knowledge as to the properties of physics or metals, and therefore I think that it is just causing problems for us all to expect him to respond to questions pertaining to matters of the properties of the metals or the laws of physics, and I would suggest that you attempt to confine it to his experience.

Ingersoll-Rand claims that the interruption of its cross-examination of Lowe was prejudicial error. "Although cross-examination is an essential element of our system of adversarial advocacy, the proper scope for cross-questioning is . . . a matter

of trial court discretion which we do not lightly disturb." *N. V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp.*, 590 F.2d 415, 421 (2d Cir. 1978). Ingersoll-Rand contends that in this instance the trial court abused its discretion.

■ Although we agree with the statement in *Safeway Stores, Inc. v. Combs*, 273 F.2d 295, 296 (5th Cir. 1960), cited by Ingersoll-Rand, that counsel should be given elbow-room in cross-examination of an expert as to the basis for his inferences, we do not believe Ingersoll-Rand has met the heavy burden of showing abuse of discretion. Rule 702 of the Federal Rules of Evidence provides that a witness may be qualified as an expert by "knowledge, skill, experience, training or education." Lowe's qualification as an expert was a matter for the discretion of the trial court. *Universal Athletic Sales Co. v. American Gym*, 546 F.2d 530, 537 (3d Cir. 1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977).

Lowe had qualified as an expert on the basis of his experience. However, counsel for Ingersoll-Rand was questioning him on technical matters, involving knowledge of physics and metallurgy, which were unrelated to the basis of his expertise, which was his experience. His lack of knowledge of these subjects was admitted and was remarked upon by the trial judge, and therefore did not need to be established through cross-examination. Thus, *Carter Products, Inc. v. Federal Trade Commission*, 201 F.2d 446 (9th Cir.), *vacated*, 346 U.S. 327, 74 S.Ct. 2, 98 L.Ed. 4 (1953), relied on by Ingersoll-Rand, is inapposite as the restrictions on cross-examination were more extreme and involved matters clearly related to the bases of expertise of the witnesses.

The Supreme Court has stated that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). The jury clearly knew that Lowe did not claim

expertise through education, and therefore could evaluate the weight to be given his testimony on that ground. The trial court was entitled to decide that further cross-examination along the requested line would be fruitless.

Caisson argues that in any event the restriction on cross-examination of the expert was not prejudicial because there was other evidence from which the jury could have found a design defect in the fact that the shank of the DHD–130 was being used with a bit face with a surface area 50% greater than that of the DHD–124 for which it had originally been designed. Caisson notes that under Illinois law it could establish a design defect by circumstantial evidence or expert opinion. *Mullen v. General Motors Corp.*, 32 Ill.App.3d 122, 336 N.E.2d 338 (1st Dist. 1975). It cites as such circumstantial evidence the repeated failures of the original bit, its uniform success after redesign when the cross section of the shank was increased by 50%, the breaking of the shanks used by one of the two other users of the DHD–130, and the marketing of the DHD–130 without any field tests or stress analysis of the shank. Since we find that the trial court did not abuse its discretion in restricting the cross-examination in this case, we need not determine whether, as Caisson argues, that was not prejudicial. However, we note that Ingersoll-Rand had the opportunity which it used to present its own expert witnesses, whose testimony was directly contrary to that of Lowe. Furthermore, it was not restricted from arguing to the jury that a knowledge of physics and metallurgy, which Lowe admittedly did not have, was essential to make an informed judgment concerning the existence of a design defect in this case. Therefore, we decline to direct a new trial on the ground that the cross-examination was too severely circumscribed.

## IV.

### Failure to Respond in Discovery

Ingersoll-Rand claims that the trial court erred in not granting its motion for a new

trial because of Caisson's failure to respond in discovery with some of the information and documents on which its damage claims were based. In considering this claim, we must review in some detail the nature of Caisson's evidence of damage.

Caisson's damage claim was based on a study prepared by its President, Guy Revesz, which had eight components identified as A–1 to G–1, each representing a separate item. Revesz explained that the VEPCO job lasted almost a year and for purposes of the damage study, he divided the year into four periods of time; the first was the 17-week period when the original superdrill was in the job, the second was the 3-week period when New Jersey Drilling was hired by Caisson to remove rock, the third was a 6-week period when there was no rock equipment on the job at all, and the fourth was a 26-week period when the redesigned rock tool was on the job. A–1 was the computation made for Excess Shifts, the number of shifts which Revesz estimated were used with DHD–130 before its redesign which would not have been necessary had the drill worked properly. To compute this Revesz compared the operation of the redesigned drill in the last period with the operation of the drill before redesign. He calculated the number of shifts worked in the relevant periods; reduced that number by the number of shifts lost ("downtime") for reasons unrelated to the drill, such as inclement weather; determined the rate of rock removal with the redesigned tool; and then calculated the number of shifts it would have taken to remove the original quantity of rock in the first period with the redesigned drill. On this basis he was able to calculate the number of shifts which he denominated as "Excess Shifts." He then multiplied the number of Excess Shifts by the average cost per shift to arrive at the cost of this item of claimed damage. The B–1 item of damage was Excess Costs per Shift, arrived at by comparing the dollar

value for an average shift for the last six months when the redesigned drill was in use with the higher dollar value for the period when the original drill was used; B–2 was the same item for the period that New Jersey Drilling was working. C–1 was the cost of hiring New Jersey Drilling for the three-week period.[4] D–1 was the cost of the equipment rented in an attempt to substitute other equipment for the inoperative drill. E–1 represented a claimed item of damage for Excess Cost for the 24 shifts worked when there was no equipment on the job. Revesz calculated that the shifts during that period were 20% effective in doing some necessary work, such as cleaning holes that were already opened, and claimed as damage 80% of the cost of these shifts. F–1 represented a credit Revesz believed was appropriate to deduct from the claimed damage for the cost of bits used when the rock was removed during the first two periods of the relevant year. The final item of damage, G–1, was attributed by Revesz to Overhead Chargeable to 14.3 Extra Weeks. He calculated the job required 14.3 extra weeks to complete because of the claimed defect in the drill, calculated that 13% of the total job cost should have contributed to the corporate on-site overhead, and multiplied the cost of the 14.3 extra weeks by 13% to arrive at this item of claimed damage.

Ingersoll-Rand objected at trial and alleges on appeal that the damage study should not have been submitted to the jury because Caisson failed to identify two items of information regarding damages in response to Ingersoll-Rand's discovery requests. The first item was a worksheet which had been prepared by Caisson's office manager in Chicago and which summarized the downtime lost during the first six months on the VEPCO job and the reason for each such item. This was relevant to item A–1 above. Ingersoll-Rand did not dispute that Caisson had made available to

**4.** The claimed damage for this item included $28,035.80 which was charged by New Jersey Drilling to Caisson as fifty percent of the cost of repair to New Jersey Drilling equipment damaged on the VEPCO job site. Caisson de-

nied it owed this money to New Jersey Drilling, and the trial court excluded this potential debt from the jury's consideration as too remote to the damages in this action.

it in discovery the daily work reports, which were all of the original documents from which this intermediate calculation was prepared. The trial judge ruled that from one point of view, Caisson failed to comply with the rules in making these documents available; he noted Caisson had made the immediate records from which the witness calculated the damages available to defendants. He directed Caisson to produce the documents to Ingersoll-Rand's counsel who could study them over the weekend [5] so that they would be available for cross-examination of the witness. When trial resumed, Ingersoll-Rand did not allege that the worksheets contained any error in calculation or allocation which it could not have ascertained from the daily records which were made available to it during discovery, nor has it so claimed on appeal when it has had ample opportunity to review the original records, the intermediate worksheets, and the final damage study.

The second item which is the subject of the claimed failure to produce was a worksheet prepared by Peat, Marwick, Caisson's accountant, which allocated overhead costs to all of Caisson's contracts during the year. These were prepared annually by the accountants in the usual course of business in connection with the annual audit. Revesz testified he used the overhead cost allocation which Peat, Marwick had prepared in calculating the item of claimed damage in G–1 for overhead chargeable to the extra weeks. Ingersoll-Rand claims that the failure of Caisson to supply the Peat, Marwick worksheet precluded effective cross-examination. Caisson contends that Revesz referred to the worksheet in his Saturday testimony and that Ingersoll-Rand made no request that it be supplied so that it could be examined together with the downtime worksheets before Ingersoll-Rand's counsel began cross-examination of Revesz the following Monday. The trial judge, who had the opportunity to both hear and observe the witness, ruled that the witness had referred to the document on Saturday and that Ingersoll-Rand's Monday complaint,

made after there would have been the opportunity to remedy the situation, was not timely.

Ingersoll-Rand relies on this court's opinion in *Seaboldt v. Pennsylvania Railroad Co.*, 290 F.2d 296 (3d Cir. 1961), which held that a new trial was warranted when the trial court found that plaintiff's attorney deliberately failed to disclose the identity of the chiropractor who had examined plaintiff. In view of the chiropractor's subsequent testimony that plaintiff previously had a "chronic" back ailment, this court found that prejudice had been shown.

We cannot find such prejudice from the record in this case, nor can we equate the failure to identify the two documents with the deliberate misconduct which was found to exist in *Seaboldt*. In *Seaboldt*, defendant's counsel requested a hearing on that issue which resulted in the finding of fact on which this court based its reversal. In this case, Caisson's counsel represented he was unaware of the documents, Ingersoll-Rand made no request for a hearing on that issue, and the court made no finding of deliberate misconduct. It is also a great deal more difficult to find prejudice on the face of this record. We have reviewed the document in question which is an accountant's one-page worksheet listing 22 different jobs, among them the VEPCO job (identified by its other name "N. Anna Power Station"), with columns showing, inter alia, the contract costs. The document is not self-explanatory but Ingersoll-Rand's counsel did not request additional time to review it and to recall Revesz for additional cross-examination.

■ Furthermore, there is no allegation of surprise as to the damage claim, nor could there be because the entire damage calculation (before the witness made subsequent reductions) had been submitted to Ingersoll-Rand more than a year before trial. It had ample opportunity to examine claimant's original records and its underlying damage theory. In the absence of a

---

5. The ruling was made late Saturday afternoon and the trial resumed Monday morning.

showing of specific prejudice,[6] rather than general prejudice, we are not inclined to reverse the judgment of the trial judge who carefully followed the presentation of the damage calculations and who made a conscientious effort to rectify any possible prejudice which may have resulted from the failure to identify documents once Ingersoll-Rand's counsel brought it to his attention in a timely fashion.

For the foregoing reasons, we will affirm the judgment of the district court.

---

**6.** On appeal, Ingersoll-Rand claims that the jury had not understood the damage theory because it allocated damages in the separate items to inappropriate interrogatories. Although there was clearly a misallocation, the total amount awarded exactly equalled the damages claimed for the various items, less the credit represented by F–1. Ingersoll-Rand did not appeal from the amount of damages, and therefore we do not consider this claim.