ILLINOIS HEALTH MAINTENANCE ORGANIZATION GUARANTY ASSOCIATION, Plaintiff-Appellant and Cross-Appellee, v. NATHANIEL S. SHAPO, Director of Insurance, *et al.*, Defendants-Appellees (EHS Hospitals-Bethany Hospital *et al.*, Defendants-Appellees and Cross-Appellants).— LITTLE COMPANY OF MARY HOSPITAL *et al.*, Plaintiffs, v. ILLINOIS HEALTH MAINTENANCE ORGANIZATION GUARANTY ASSOCIATION, Defendant.

First District (6th Division) Nos. 1—02—0264, 1—02—0409 through 1—02—0412, 1—02—0686, 1—02—1149 through 1—02—1162, 1—02—1437 through 1—02—1440, 1—02—1443, 1—02—2220, 1—02—2222 through 1—02—2233 cons.

Opinion filed March 31, 2005.

Foley & Lardner, of Chicago (William Carlisle Herbert, Mary Kay Martire, Andrew L. Reisman, and Tiffany C. Woodie, of counsel), for appellant.

Bell, Boyd & Lloyd, L.L.C., of Chicago (William F. Dolan and Daniel J. Lawler, of counsel), for appellees Loyola University Medical Center, University of Chicago Hospitals, EHS Hospitals-Bethany Hospital, EHS Hospitals-Christ Hospital, and EHS Hospitals-South Chicago Community Hospital.

Mayer, Brown, Rowe & Maw, of Chicago (Alan J. Martin, Marc E. Rosenthal, and Robert M. Dow, Jr., for appellees Nathaniel S. Shapo and Department of Insurance.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:
Plaintiff-appellant, the Illinois Health Maintenance Organization Guaranty Association (plaintiff or Association), filed 24 complaints for administrative review in the trial court seeking review of decisions issued by Nathaniel Shapo, the Director of the Illinois Department of

Insurance (Department). In those decisions Director Shapo (the Director) found plaintiff liable to health care providers for services rendered by them to enrollees of an insolvent health maintenance organization (HMO) known as MedCare HMO, Inc. (MedCare). MedCare was the largest HMO insolvency in Illinois state history. Over the course of approximately six years, the parties took more than 40 depositions, approximately 60 hearings were conducted, and a record of over 12,000 pages was generated. The record consists of 96 volumes.

The following 24 defendants-appellees are health care providers that provided services to MedCare enrollees: EHS Hospitals-Christ Hospital, EHS Hospitals-South Chicago Community Hospital, EHS Hospitals-Bethany Hospital, University of Chicago Hospitals, Loyola University Medical Center, South Suburban Hospital, Children's Memorial Hospital, St. James Hospital-Chicago Heights, Little Company of Mary Hospital, Oak Park Hospital, Grant Hospital, Loyola Medical Practice Plan, University of Chicago Physician's Group, Westlake Community Hospital, Westside Community Hospital, d/b/a Sacred Heart Hospital, Thorek Hospital and Medical Center, SSM Regional Health Services, d/b/a St. Francis Hospital and Health Center, Hartgrove Hospital, County of Cook on behalf of John H. Stroger, Jr., Hospital of Cook County, Paul T. Atkenson, St. Bernard Hospital, Rush-Presbyterian-St. Luke's Hospital, Ravenswood Hospital and Medical Center, and West Suburban Hospital.

The Director's decisions addressed three separate issues: plaintiff's liability to the providers for services rendered, plaintiff's liability for interest on principal amounts awarded, and the allocation of hearing costs. The Director found plaintiff liable to 20 of the 24 providers and awarded specific principal amounts but declined to assess interest on those principal amounts. Based upon the "contract" (or "contracted provider") defense relied upon by plaintiff in motions for summary disposition, the Director did not find plaintiff liable to the following four providers: St. Bernard Hospital, Hartgrove Hospital, St. James Hospital-Chicago Heights, and Thorek Hospital and Medical Center. The Director assessed hearing costs against plaintiff as well as these four providers. Plaintiff's complaints against these four providers seek review of the Director's decision only on the issue of hearing costs.

The trial court consolidated plaintiff's administrative complaints and subsequently dismissed them because plaintiff did not request a rehearing before the Director prior to filing them and thus failed to exhaust its administrative remedies. The trial court later entered judgments on the Director's awards; those judgments totaled more than $22 million and included prejudgment and postjudgment statutory interest.

Plaintiff appeals the dismissal of its 24 complaints, contending the trial court refused to consider its underlying claims by improperly applying the exhaustion doctrine. Plaintiff further contends it was not liable for the underlying monetary judgments and hearing costs. In addition, three of the care providers, EHS Hospitals-Bethany Hospital, EHS Hospitals-Christ Hospital, and EHS Hospitals-South Chicago Community Hospital, cross-appeal the amount of prejudgment interest awarded in their favor by the trial court.

## BACKGROUND

Plaintiff is a legal entity created by the Illinois Health Maintenance Organization Guaranty Association Law (Guaranty Law) (215 ILCS 125/6—1 et seq. (West 2000)). The purpose of the Guaranty Law is "to protect enrollees of health care plans who reside in [Illinois], and their beneficiaries, payees and assignees, *** against failure in the performance of contractual obligations due to the impairment or insolvency of the organization operating such health care plans." 215 ILCS 125/6—2 (West 2000). The Guaranty Law gives plaintiff specified powers and duties to carry out this purpose. Among other things, if a health maintenance organization (HMO) is insolvent, plaintiff "shall, subject to the approval of the Director *** assure payment of the contractual obligations of the insolvent organization to covered persons." 215 ILCS 125/6—8(2)(b) (West 2000).

The providers rendered health care services to several thousand people enrolled in MedCare pursuant to contracts they had with Med-Care. In addition, MedCare contracted with the Illinois Department of Public Aid (IDPA) to provide or pay for health care services, including emergency services, to public aid recipients. The providers submitted bills to MedCare for the services rendered, but MedCare failed to pay them. MedCare was declared insolvent by the circuit court of Cook County on January 4, 1993. Following the declaration of MedCare's insolvency, the providers submitted payment claims to plaintiff for services rendered to MedCare's enrollees. Plaintiff denied the claims, and the providers in turn sought review by the Director under the Guaranty Law. In October 1994, hearing officers Michael B. Nash and Royal B. Martin were appointed to conduct hearings on the providers' claims.

Plaintiff asserted numerous defenses to the providers' claims. The hearing officers rejected most of plaintiff's alleged defenses and found plaintiff liable to 20 of the 24 providers for their principal claims and for prejudgment interest. Based upon the findings of the hearing officers that plaintiff was liable to 20 of the 24 providers for various principal amounts and interest on those amounts, plaintiff and the

providers entered into stipulations specifying the total amount of principal and interest plaintiff would owe each provider if the hearing officers' conclusions were upheld. The hearing officers submitted their findings of fact, conclusions of law, and recommendations to the Director and recommended hearing costs totaling $499,526.49, of which $491,526.49 was allocated to plaintiff. The Director adopted and approved the hearing officers' findings of fact and conclusions of law on the principal claims in the stipulated amounts. The Director, however, declined to award interest on those principal amounts, concluding that he lacked statutory authority to do so. The Director accepted the hearing officers' recommendation that hearing costs be imposed, but reduced the $499,526.49 in hearing costs recommended by them based on a payment made by the Department in partial satisfaction of that amount. Specifically the Director imposed hearing costs pursuant to section 408(5) of the Illinois Insurance Code (Code) (215 ILCS 5/408(5) (West 2000)) totaling $295,023.94, of which $289,122.54 was assessed against plaintiff.

Plaintiff did not request a rehearing on any of the Director's orders. Rather, it filed 24 separate complaints for administrative review in the trial court. Twenty of the complaints were brought by plaintiff against the twenty providers to which the Director found plaintiff liable for principal amounts and hearing costs. The other four complaints were brought by plaintiff against the four providers to which the Director found plaintiff was not liable; these complaints sought review of the Director's decision only on the issue of hearing costs.

Fourteen providers filed separate administrative complaints in the trial court seeking judicial review only of the part of the Director's decisions which denied them interest. Plaintiff moved to consolidate its 24 cases with the providers' 14 cases. The motion to consolidate was granted. All the providers filed motions to dismiss plaintiff's complaints pursuant to section 2—619(a) of the Illinois Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 2000)) based on plaintiff's failure to exhaust its administrative remedies. In these motions, the providers relied upon section 2402.280(c) of the Illinois Administrative Code (50 Ill. Adm. Code § 2402.280 (2000)), which provides that rehearing motions "shall be filed within 10 days of the date of mailing of the Director's Order." In orders dated December 21, 2001, February 1, 2002, and April 3, 2002, the trial court dismissed all of plaintiff's complaints for administrative review, concluding that the supreme court's holding in *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304 (1989), required plaintiff to request a rehearing with the Director before filing those complaints.

In addition to dismissing plaintiff's complaints, the trial court dismissed, pursuant to *Castaneda*, 9 of the 14 complaints filed by the providers seeking judicial review of the Director's decision denying an award of interest. Those nine dismissed complaints were filed by the following nine providers: Little Company of Mary Hospital, County of Cook on behalf of John H. Stroger, Jr., Hospital of Cook County, Oak Park Hospital, Grant Hospital, Loyola Medical Practice Plan, University of Chicago Physicians Group, Westlake Community Hospital, Rush-Presbyterian-St. Luke's Medical Center, and SSM Regional Health Services, d/b/a St. Francis Hospital and Health Center. The trial court did not dismiss the remaining five complaints pursuant to *Castaneda* as the providers which filed those complaints sought rehearing before the Department prior to filing their complaints.

Plaintiff filed notices of appeal on separate dates seeking review of the trial court's dismissals of its complaints. After some of these notices of appeal were filed, the trial court entered monetary judgments against plaintiff. In support of these judgments, the trial court reasoned "it is logically inconsistent for me to find other than, by dismissing a complaint for administrative review, I have done anything other than affirm the decision of the administrative body." Regarding the principal amounts awarded by the Director, the trial court rejected plaintiff's contention that the trial court no longer had jurisdiction over the cases that were then before the appellate court on appeal, noting that entry of a monetary judgment was "merely a ministerial act in completing the order." In addition to awarding the providers the principal amounts specified in the Director's order, the trial court awarded statutory interest at a prejudgment rate of 5% and a post-judgment rate of 9%.

Plaintiff now appeals the dismissals of its complaints and the trial court's entry of monetary judgments.

We note that in addition to plaintiff, the above-mentioned nine providers (those that filed the complaints challenging the Director's refusal to award interest which were dismissed by the trial court) filed notices of appeal seeking review of the dismissal of their complaints. The appellate court entered an order consolidating those appeals with the appeals filed by plaintiff under case number 1—02—0264 (which was the appeal number originally assigned to the appeal filed by provider County of Cook on behalf of John H. Stroger, Jr., Hospital of Cook County), and accordingly the captions included on the appellate briefs as well as many related documents designate "County of Cook on behalf of John H. Stroger, Jr. Hospital of Cook County" as "plaintiff-appellant." We note, however, that none of the nine providers which filed notices of appeal has filed appellate briefs requesting

relief from this court with respect to their dismissed cases. In fact, pursuant to a motion filed by the above nine providers, this court entered an order dispensing with briefing requirements and holding their appeals in abeyance. Thus, these providers are designated not as "plaintiffs-appellants" but as "plaintiffs" in the second case listed in the instant case caption. Correspondingly, the Association is designated not as "defendant-appellee" but rather as "defendant" in that portion of the case caption. The appellate court numbers listed in the header above the case caption correspond with the notices of appeal filed by the above providers as well as notices of appeal filed by plaintiff with respect to the trial court's dismissals of its complaints and subsequent entry of monetary judgments on behalf of the providers.

## DISMISSAL BASED ON EXHAUSTION OF REMEDIES DOCTRINE

Plaintiff challenges the dismissal of its claims, contending that the trial court "erroneously concluded that a party aggrieved by a decision of the Director must file a petition for rehearing with the Director before seeking judicial review." We apply *de novo* review to the question of whether the trial court properly dismissed all of plaintiff's complaints pursuant to section 2—619 of the Illinois Code of Civil Procedure (735 ILCS 5/2—619 (West 2000)). *Consolidated Freightways Corp. of Delaware v. Human Rights Comm'n*, 305 Ill. App. 3d 934, 938 (1999) (applying *de novo* review to a section 2—619 dismissal for failure to exhaust administrative remedies).

■ The exhaustion of administrative remedies doctrine "has long been a basic principle of administrative law—a party aggrieved by administrative action ordinarily cannot seek review in the courts without first pursuing all administrative remedies available to him." *Illinois Bell Telephone Co. v. Allphin*, 60 Ill. 2d 350, 357-58 (1975). "Requiring the exhaustion of remedies allows the administrative agency to fully develop and consider the facts of the cause before it *** [and] to utilize its expertise; and it allows the aggrieved party to ultimately succeed before the agency, making judicial review unnecessary." *Castaneda*, 132 Ill. 2d at 308. "The doctrine also helps protect agency processes from impairment by avoidable interruptions, allows the agency to correct its own errors, and conserves valuable judicial time by avoiding piecemeal appeals." *Castaneda*, 132 Ill. 2d at 308.

■ While strict compliance with the doctrine is generally required, there are several exceptions to the doctrine:

"An aggrieved party may seek judicial review of an administrative decision without complying with the exhaustion of remedies doctrine where a statute, ordinance or rule is attacked as unconsti-

tutional on its face [citations], where multiple administrative remedies exist and at least one is exhausted [citations], where the agency cannot provide an adequate remedy or where it is patently futile to seek relief before the agency [citations], where no issues of fact are presented or agency expertise is not involved [citations], where irreparable harm will result from further pursuit of administrative remedies [citations], or where the agency's jurisdiction is attacked because it is not authorized by statute [citation]." *Castaneda*, 132 Ill. 2d at 308-09.

In *Castaneda*, the plaintiff filed an employment discrimination charge with the Illinois Department of Human Rights. *Castaneda*, 132 Ill. 2d at 307. Thereafter, the Department of Human Rights filed a complaint against the defendant employer, alleging violations of the plaintiff's civil rights. *Castaneda*, 132 Ill. 2d at 307. Following a full hearing, an administrative law judge (ALJ) found no discrimination against the plaintiff and recommended dismissal of the complaint. *Castaneda*, 132 Ill. 2d at 307. A three-member panel of the Illinois Human Rights Commission adopted the recommendations of the ALJ and dismissed the complaint. *Castaneda*, 132 Ill. 2d at 307. Although the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 *et seq.*) included a provision that gave the plaintiff the right to request a rehearing before the full Commission, the plaintiff did not request such a rehearing. *Castaneda*, 132 Ill. 2d at 310-11. Rather, the plaintiff appealed the dismissal to the appellate court, which in turn *sua sponte* dismissed the appeal, finding "that petitioner failed to exhaust his administrative remedies by not requesting a rehearing of the panel decision by the entire Illinois Human Rights Commission." *Castaneda v. Human Rights Comm'n*, 175 Ill. App. 3d 1085, 1088 (1988). The rehearing provision in the Human Rights Act specifically provided:

" 'Rehearing. (1) Within 30 days after service of the Commission's order, a party *may* file an application for rehearing before the full Commission. \*\*\*

(2) Applications for rehearing shall be viewed with disfavor, and may be granted, by vote of 6 Commission members, only upon a clear demonstration that a matter raises legal issues of significant impact or that three-member panel decisions are in conflict.' " (Emphasis added.) *Castaneda*, 132 Ill. 2d at 310-11, quoting Ill. Rev. Stat. 1987, ch. 68, pars. 8—107(F)(1),(F)(2).

The plaintiff and Commission (the appellants) in *Castaneda* appealed the appellate court's dismissal to the supreme court, contending that "the mere availability of a rehearing procedure does not necessarily mean a party must use such a procedure." *Castaneda*, 132 Ill. 2d at 313. To support this characterization of the exhaustion doctrine, the appellants relied on section 3—101 of the Administrative Review Law (Review Law), which states in relevant part:

" 'In all cases in which a statute or a rule of the administrative agency requires or permits an application for a rehearing or other method of administrative review to be filed within a specified time (as distinguished from a statute which permits the application for rehearing or administrative review to be filed at any time before judgment by the administrative agency against the applicant or within a specified time after entry of such judgment), and an application for such rehearing or review is made, no administrative decision of such agency shall be final as to the party applying therefor until such hearing or review is had or denied.' " (Emphasis omitted.) *Castaneda*, 132 Ill. 2d at 313, quoting Ill. Rev. Stat. 1987, ch. 110, par. 3—101.

The appellants in *Castaneda* argued that the language in section 3—101 distinguishing between agencies which require applications for rehearing and those which merely permit them supported their view that a party need not request a rehearing when the regulation or statute in question merely permits but does not require such a request. *Castaneda*, 132 Ill. 2d at 313. The appellants argued that because the rehearing provision in the Human Rights Act was discretionary, the appellate court improperly concluded that the plaintiff had failed to exhaust his administrative remedies. *Castaneda*, 132 Ill. 2d at 313.

The supreme court in *Castaneda* rejected the appellants' argument and concluded that "[t]he principles underlying the exhaustion of remedies doctrine require a party to seek an administrative remedy where one is still available and where seeking such a remedy will not lead to damage or unfairness to that party." *Castaneda*, 132 Ill. 2d at 323. In support of this conclusion, the supreme court cited section 3—102 of the Review Law, which states that if " 'an administrative decision has become final because of the failure to file any document in the nature of objections, protests, petition for hearing or application for administrative review within the time allowed *** such decision shall not be subject to judicial review.' " *Castaneda*, 132 Ill. 2d at 320, quoting Ill. Rev. Stat. 1987, ch. 110, par. 3—102. The supreme court found that section 3—102 clarified ambiguity in section 3—101, that sections 3—101 and 3—102 of the Review Law reflected a legislative intent to codify the exhaustion of remedies doctrine, and that the "underlying principle" of section 3—102 was that "aggrieved parties who fail to exercise all procedural remedies available to them in the allotted time relinquish any opportunity for judicial review." *Castaneda*, 132 Ill. 2d at 320.

The supreme court additionally noted that applying the exhaustion of remedies doctrine to the case before it was consistent with the purposes underlying the exhaustion of remedies doctrine and the Hu-

man Rights Act. *Castaneda*, 132 Ill. 2d at 323. Specifically, the supreme court stated:

> "The principles underlying creation of the Human Rights Commission require that the Commission, in its expertise, should be allowed every opportunity to dispose of complaints involving civil rights violations fairly and efficiently. Requiring the application for rehearing gives the Commission a second opportunity to fulfill that purpose. Allowing panel decisions to be appealable, however, skips over an available remedy and offends the legislative purposes in empowering the Commission." *Castaneda*, 132 Ill. 2d at 323.

■ Following *Castaneda*, we find that the exhaustion of remedies doctrine required plaintiff to file motions for rehearing with the Department before filing complaints for administrative review in the circuit court. Here, the Code provided a procedural remedy which plaintiff failed to pursue. Specifically, section 2402.280(c) of the Illinois Administrative Code provides: "A motion for a rehearing or a motion for the reopening of a hearing shall be filed within 10 days of the date of mailing of the Director's Order." 50 Ill. Adm. Code § 2402.280(c) (2000). Regarding the requisite 10-day filing period, we note that the mandatory language "shall be filed" included in this regulation is even stronger than the permissive language "may file" included in the regulation at issue in *Castaneda*. Our ruling in the instant case is limited to application of *Castaneda* in the context of the "shall be filed" language as reflected in section 2402.280(c) of the Administrative Code, the operative provision in the instant case.

Requiring plaintiff to file a petition for rehearing in order to preserve its right to seek administrative review in the circuit court was consistent with the purposes underlying the exhaustion of remedies doctrine. A rehearing request would have given the Department the opportunity to review its decision and to correct any errors that it may have possibly made. As noted earlier, the administrative proceedings in the instant case were very extensive. The hearing officers, not the Director, conducted proceedings which lasted six years and generated several thousand pages of record. The Department was familiar with this record, had applied its expertise during the course of the proceedings, and was in an able position to efficiently review any errors alleged by plaintiff. A rehearing would have enabled the Department to review alleged errors and to correct or reverse them at the administrative stage of the proceedings, which, according to *Castaneda*, is when such errors should be first addressed. *Castaneda*, 132 Ill. 2d at 320-21.

As previously noted, "[r]equiring the exhaustion of remedies allows the administrative agency to fully develop and consider the facts

of the cause before it *** [and] to utilize its expertise; and it allows the aggrieved party to ultimately succeed before the agency, making judicial review unnecessary." *Castaneda*, 132 Ill. 2d at 308. "The doctrine also helps protect agency processes from impairment by avoidable interruptions, allows the agency to correct its own errors, and conserves valuable judicial time by avoiding piecemeal appeals." *Castaneda*, 132 Ill. 2d at 308. The dismissal of plaintiff's complaints for administrative review by the circuit court was consistent with the above purposes, with section 2402.280 of the Illinois Administrative Code (50 Ill. Adm. Code § 2402.280 (2000)), and with sections 3—101 and 3—102 of the Review Law (735 ILCS 5/3—101, 102 (West 2000)).

Plaintiff contends that *Castaneda* should be narrowly limited "to decisions of three-member panels of the Human Rights Commission." We recognize the supreme court in *Castaneda* stated the "sole issue" before it was "whether petitioners seeking judicial review of decisions by three-member panels of the Human Rights Commission must seek an *en bloc* rehearing before the Commission in order to exhaust their administrative remedies and to render such decisions final and reviewable." *Castaneda*, 132 Ill. 2d at 308. In order to resolve that issue, the supreme court clarified and applied the exhaustion of remedies doctrine to the case before it. The supreme court did not, however, state the exhaustion of remedies doctrine was applicable only to the Human Rights Commission. Indeed, if the supreme court had intended to fashion a rule of exhaustion with such limited application, it would not have overruled appellate court decisions involving other agencies. See *Castaneda*, 132 Ill. 2d at 330 (noting that previously cited appellate court cases were overruled to the extent they conflicted with the supreme court's decision).

In a related argument, plaintiff contends that a petition for rehearing is unnecessary where an administrative decision is rendered at the highest level of the agency and cites three non-First District appellate cases to support that proposition: *Grigoleit Co. v. Pollution Control Board*, 245 Ill. App. 3d 337 (1993) (Fourth District), *Strube v. Pollution Control Board*, 242 Ill. App. 3d 822 (1993) (Third District), and *Seelhoefer v. Regional Board of School Trustees of Clinton & Washington Counties*, 266 Ill. App. 3d 516 (1994) (Fifth District). We decline, however, to apply this proposition to the case before us as it is inconsistent with the supreme court's decision in *Castaneda*.

In *Grigoleit*, the petitioner sought administrative review of a decision rendered by the Illinois Pollution Control Board without first requesting a rehearing of the Board's decision. *Grigoleit*, 245 Ill. App. 3d at 338-39. The appellate court found that the petitioner's failure to request a rehearing did not prohibit it from reviewing the Board's

decision. *Grigoleit*, 245 Ill. App. 3d at 339. The court concluded that it was not bound by *Castaneda* because the administrative decision before it was rendered by the entire Board rather than a three-member panel. *Grigoleit*, 245 Ill. App. 3d at 342.

As discussed earlier, the supreme court in *Castaneda* found that sections 3—101 and 3—102 of the Review Law codified the exhaustion doctrine and construed those sections (and thus the exhaustion doctrine) to generally require dismissal of a complaint for administrative review when (1) an agency provides a party with a procedure for requesting a rehearing within a specified time and (2) the party fails to do so. See *Castaneda*, 132 Ill. 2d at 313, 320-21, 323. While the supreme court applied this rule of exhaustion to an administrative action seeking review of a decision by a three-member panel, it did not limit its applicability to decisions rendered by less-than-full administrative decisionmaking bodies. Indeed, although the supreme court listed a series of exceptions to the exhaustion doctrine, it did not state the doctrine should not be applied when the subject decision has initially been rendered at the highest level of the agency or is to be reheard by the same individuals within the administrative agency who rendered the original decision.

In the instant case, the Director of the Department of Insurance issued the original decision after two hearing officers conducted hearings and made written recommendations to him. Had plaintiff requested a rehearing of the Director's decision, that rehearing may or may not have been conducted before the Director or the original hearing officers appointed by him. See 215 ILCS 5/402(1) (West 2000) (all hearings under the Insurance Code "may be conducted either by the Director personally, or by one or more of the actuaries, technical advisors, deputies, supervisors or examiners employed or retained by the Department and designated by the Director for such purpose"). Whatever the case, a rehearing, regardless of who would have conducted it, would have been consistent with the primary purposes underlying the exhaustion doctrine. As recognized by the supreme court in *Castaneda*, the application for rehearing gives the subject agency a "second opportunity" to apply its expertise in order to efficiently dispose of administrative complaints. *Castaneda*, 132 Ill. 2d at 323. Indeed, as noted earlier, one of the exhaustion doctrine's primary purposes is to give an administrative agency the opportunity to correct its own errors. We believe that full boards and the highest decisionmaking authorities within agencies are capable of correcting their own errors, and accordingly we decline to follow the decision in *Grigoleit* to the extent it stands for the proposition that the exhaustion doctrine does not apply when the initial administrative decision is

rendered by a full board or at the highest level of the agency. Similarly, because *Seelhoefer* and *Strube* relied on the same rationale articulated in *Grigoleit* (see *Seelhoefer*, 266 Ill. App. 3d at 520-21; *Strube*, 242 Ill. App. 3d at 825-26), we also decline to follow them.

The only First District case cited by plaintiff to support its contention that it was not required to file a rehearing request is *Ambrose v. Thorton Township School Trustees*, 274 Ill. App. 3d 676 (1995). Although plaintiff concedes that *Ambrose* did not directly address this issue, it contends that the First District "implicitly approved" a decision of the circuit court excusing the rehearing requirement. Plaintiff's reliance on *Ambrose* is misplaced.

In *Ambrose*, the plaintiffs sought judicial review of a decision of the joint board of trustees of schools (Joint Board) that denied a territorial annexation petition. *Ambrose*, 274 Ill. App. 3d at 678-79. The trial court reversed the Joint Board's decision and *sua sponte* sanctioned the defendants for filing a motion to dismiss the complaint based on failure to exhaust administrative remedies. *Ambrose*, 274 Ill. App. 3d at 677-78, 684. The reviewing court affirmed the circuit court's decision to reverse the Joint Board, but reversed the *sua sponte* sanction order because the defendants had an objectively reasonable basis to move for dismissal based on the exhaustion doctrine under *Castaneda*. *Ambrose*, 274 Ill. App. 3d at 685. In support of its reversal, the reviewing court reasoned:

> "It is true that *Castaneda* may be distinguished from the present case. However, it does not necessarily follow that the defendants' arguments for extending *Castaneda* were in bad faith. There is an equally reasonable argument that *Castaneda* should be applied to the present case given the similarity of the statutory language. Therefore, we conclude that under the law as of the date of the motion to dismiss, it was objectively reasonable for the defendants to argue for the extension of *Castaneda*." *Ambrose*, 274 Ill. App. 3d at 685.

Plaintiff concedes that the appellate court in *Ambrose* did not address the merits of the motion to dismiss. Plaintiff contends, however, that the appellate court "must have" implicitly addressed the rehearing issue because it was "jurisdictional." Nothing in the court's opinion addressed jurisdiction. We note, rather, that *Ambrose* recognizes that the arguments for application of *Castaneda* were made in good faith and were objectively reasonable. Thus, *Ambrose* does not provide a basis for excusing application of the exhaustion doctrine in the instant case.

As previously noted, *Castaneda* recognized several exceptions to the exhaustion of remedies doctrine. Plaintiff relies on the exception

that excuses parties from exhausting administrative remedies when resolution of the issue does not implicate the agency's expertise but instead turns solely on statutory construction. See *Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 306-07 (1995) (when issue is one of statutory interpretation, it does not implicate agency's expertise and is not barred by exhaustion doctrine). Specifically, plaintiff contends it should be excused from exhausting its administrative remedies because "legal questions presented by [plaintiff's] complaints are issues of statutory construction on which courts are the experts, not the Director."

As an initial matter, we note that plaintiff did not raise this argument in response to the providers' motions to dismiss its complaints for administrative review. Plaintiff admitted at the hearing on its motion for reconsideration of the trial court's dismissal of its complaints that it first raised the statutory-construction exception to the exhaustion doctrine in its motion for reconsideration. Based on plaintiff's failure to raise this argument in its response to the providers' motions to dismiss, the trial court found that plaintiff waived its right to assert this exception. We agree with the trial court and conclude that plaintiff waived its right to assert the statutory-construction exception. See *Holzer v. Motorola Lighting, Inc.*, 295 Ill. App. 3d 963, 978 (1998) (argument raised for the first time in a motion for reconsideration is waived).

Waiver aside, we find that plaintiff's argument is without merit. We are mindful that a party who challenges the validity of a statute on its face is not required to exhaust administrative remedies. *Arvia v. Madigan*, 209 Ill. 2d 520, 532 (2004). "The reason for this exception is apparent: administrative review is confined to the proofs offered and the record created before the agency." *Arvia*, 209 Ill. 2d at 532-33. "A facial attack to the constitutionality of a statute, which presents purely legal questions, is not dependent for its assertion or its resolution on the administrative record." *Arvia*, 209 Ill. 2d at 532-33. However, if a challenging party alleges that a facially valid statute has been applied in an arbitrary or discriminatory manner, " 'the rule generally prevails that recourse must be had in the first instance to the appropriate administrative board.' " *Beahringer v. Page*, 204 Ill. 2d 363, 374 (2003), quoting *Bank of Lyons v. County of Cook*, 13 Ill. 2d 493, 495 (1958); see also *Miller v. Department of Public Aid*, 69 Ill. App. 3d 477, 482-83 (1979) (noting that "the exception to the exhaustion requirement relating to an attack on a statute applies only where the statute is attacked in its terms and not where it is attacked as applied").

In the instant case, plaintiff asserted several defenses in its complaints for administrative review, including "Medicaid,"

"Contracted-Provider" (or "Contract"), "Independent Physicians' Association" (IPA), and "Illinois Department of Public Aid Rate Limitation" (IDPA) defenses. Plaintiff's Medicaid, Contract, and IDPA defenses, which it reasserts in the instant appeal, are statutorily based. Specifically, with respect to its Medicaid and Contract defenses, plaintiff alleges that it is not liable to the providers pursuant to section 6—8(8)(b)(ii) of the Guaranty Law. 215 ILCS 125/6—8(8)(b)(ii) (West 2000). Section 6—8(8)(b)(ii) states that plaintiff "shall not be required to pay, and shall have no liability to, any provider of health care services to an enrollee *** if and to the extent such a provider has agreed by contract not to seek payment from the enrollee for services provided to such enrollee or if, and to the extent, as a matter of law such provider may not seek payment from the enrollee for services provided to such enrollee." 215 ILCS 125/6—8(8)(b)(ii) (West 2000). Plaintiff does not contend that section 6—8(8)(b)(ii) is invalid on its face. Rather, plaintiff argues that application of this statutory provision would have relieved it of liability. Resolution of plaintiff's argument would have required review of the application of the statutory provision to the facts established during the course of the administrative proceedings.

Regarding its IDPA defense, plaintiff alleges that it is not liable to the providers pursuant to section 6—8(8)(c) of the Guaranty Law. 215 ILCS 125/6—8(8)(c) (West 2000). Section 6—8(8)(c) states that plaintiff shall not be required to pay "any provider participating in the insolvent organization any amount for in-plan services rendered by such provider prior to the insolvency of the organization in excess of *** the amounts provided by contract between a hospital provider and the Department of Public Aid for similar services to recipients of public aid." 215 ILCS 125/6—8(8)(c) (West 2000). Plaintiff does not contend that section 6—8(8)(c) is invalid on its face, but rather it argues that application of this statutory provision would have limited its liability. Resolution of this argument, as with plaintiff's Medicaid and Contract defenses, would have required review of the application of a statutory provision to the facts established during the administrative proceedings. In the instant case plaintiff did not challenge the validity of statutory provisions but, rather, challenged their application. Thus, the Department's expertise was implicated and the statutory construction exception did not excuse plaintiff from exhausting its administrative remedies by filing a motion for rehearing. As previously noted, a party challenging the application of a statute is generally required to exhaust its administrative remedies before seeking judicial relief. See *Beahringer*, 204 Ill. 2d at 374; see also *Miller*, 69 Ill. App. 3d at 482-83.

Finally, we note that plaintiff's "IPA defense," which it also reasserts in the instant appeal, is factually based. Specifically, plaintiff's complaints for administrative review requested the circuit court to "remand this matter *** to permit [plaintiff] to conduct the discovery necessary to determine the applicability of the IPA Referral Issue." For the reasons previously discussed, we conclude that the nature of the defenses asserted by plaintiff did not exempt them from the reach of the exhaustion doctrine.

Plaintiff also contends it was excused from exhausting its administrative remedies under the futility exception because any motion for rehearing "would have been denied as a matter of course under the Director's standard for rehearing motions." In support of this contention, plaintiff cites three previous denials by the Director of motions for rehearing. Contrary to plaintiff's contention, those denials do not establish "an existing standard" or practice by which the Director denies such motions "as a matter of course." See *Traff v. Fabro*, 337 Ill. App. 83, 88 (1949) (noting that a practice is not established by evidence of isolated incidents); accord *Premier Electrical Construction Co. v. Miller-Davis Co.*, 291 F. Supp. 295, 302 (N.D. Ill. 1968), *aff'd*, 422 F.2d 1132 (7th Cir. 1970). "[T]he fact that there are clear indications that the agency may or will rule adversely is generally inadequate to terminate the administrative process or to avoid the exhaustion requirement." *Castaneda*, 132 Ill. 2d at 328.

Plaintiff further contends it was not required to exhaust its administrative remedies based on the language in the Director's order that stated: "This Order is considered a Final Administrative Decision within the meaning of the Illinois Administrative Procedure Act [citation]; and may be appealed under the procedures set forth by the Illinois Administrative Review Law [citation]." We reject plaintiff's contention. The "procedures set forth by the Illinois Administrative Review Law" are subject to the exhaustion of remedies doctrine articulated in *Castaneda*. As discussed earlier, that doctrine required plaintiff to file a motion for rehearing before the Department in order to preserve its right to obtain the trial court's full review of the Director's decision. In short, the Director's characterization of his decision as "final" and his reference to the procedures set forth in the Illinois Administrative Review Law did not relieve plaintiff of its obligation under *Castaneda* to exhaust its administrative remedies by filing a motion for rehearing pursuant to the rehearing regulation included in section 2402.280(c) of the Illinois Administrative Code. See 50 Ill. Adm. Code § 2402.280(c) (2000) ("A motion for a rehearing or a motion for the reopening of a hearing shall be filed within 10 days of the date of mailing of the Director's Order").

## MONETARY JUDGMENTS

Plaintiff contends that even if the circuit court properly dismissed its administrative review complaints, the court improperly entered monetary judgments against it. In support of this contention, plaintiff argues that "the [Review Law] does not authorize the circuit court to enter a monetary judgment upon the dismissal of an administrative review complaint."

■ The circuit court is empowered to enter a monetary judgment when affirming or partially affirming an administrative agency's decision. See 735 ILCS 5/3—111(a)(8) (West 2000) (a circuit court may enter judgment for the amount justified by the record and for costs if the administrative decision is "affirmed or partially affirmed").

Plaintiff contends the trial court's dismissal of its complaints was not an "affirmance" of the Director's orders under section 3—111(a) of the Review Law. Contrary to plaintiff's contention, the circuit court's dismissal of its complaints for administrative review was an "affirmance" of the Director's decisions. See *Board of Education of Lockport Township High School District 205 v. Gill*, 176 Ill. App. 3d 567, 571 (1988) ("the dismissal of [an] administrative review complaint had the legal effect of affirming [the challenged] administrative decision").

Plaintiff appears to alternatively contend that even if a dismissal may qualify as an affirmance under some circumstances, the trial court's specific dismissal of its complaints did not qualify as an affirmance. Plaintiff contends that an affirmance requires a substantive review of the final orders in question and notes that here the trial court did not conduct such a review. To support this contention, plaintiff relies upon section 3—110 of the Review Law. Plaintiff's reliance on section 3—110 is misplaced.

Section 3—110 of the Review Law states that in the case of "[e]very action to review any final administrative decision," the "hearing and determination shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3—110 (West 2000). Construing section 3—110 to require a trial court to substantively review a final order when an aggrieved party fails to exhaust its administrative remedies disregards the exhaustion doctrine. Section 3—110 does not relieve a complaining party of the obligation to exhaust its administrative remedies. Indeed, substantive review is not undertaken when the complaining party fails to exhaust its administrative remedies. For the reasons previously discussed, plaintiff's complaints were properly dismissed pursuant to the exhaustion of remedies doctrine, and thus the trial court was not required to conduct a substantive review of the final orders in question.

■ Plaintiff also notes that after it filed notices of appeal from dismissals of some of its complaints, the trial court entered monetary judgments in favor of providers named in those complaints. Plaintiff contends that the filing of these notices of appeal divested the trial court of jurisdiction to enter these judgments.

We recognize that "[u]pon filing a notice of appeal, the trial court is divested of jurisdiction to enter any order involving a matter of substance, and the jurisdiction of the appellate court attaches *instanter*." *In re Marriage of Sawyer*, 264 Ill. App. 3d 839, 850 (1994). We note, however, that "trial courts retain jurisdiction after notice of appeal is filed to determine matters collateral or incidental to the judgment." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 157 Ill. 2d 282, 289 (1993).

In *In re Marriage of Ward*, 267 Ill. App. 3d 35, 44 (1994), the petitioner, like plaintiff in the instant case, argued that the trial court lacked the authority to enter a monetary judgment after a notice of appeal was filed. *In re Marriage of Ward*, 267 Ill. App. 3d at 44. The appellate court rejected the petitioner's argument, observing that the trial court "has the inherent authority to enforce its judgments." *In re Marriage of Ward*, 267 Ill. App. 3d at 44. The court explained:

"Once a notice of appeal is filed, the trial court may not enter any order changing or modifying a judgment or its scope, or interfering with the review of that judgment. [Citation.] Reducing a cash award to a money judgment merely aided [the respondent's] collection efforts. The amount of the award was not altered. The trial court did not change the scope of the judgment. Appellate review was not interfered with. The trial court acted appropriately to enforce its judgment." *In re Marriage of Ward*, 267 Ill. App. 3d at 44.

Here, plaintiff filed the subject notices of appeal after the trial court dismissed some of plaintiff's complaints seeking review of the Director's award of principal amounts to certain providers. Those dismissals by the trial court effectively constituted judgments affirming the Director's award of the principal amounts. The trial court's subsequent entry of monetary judgments did not alter its dismissals, which in effect affirmed the Director's finding of liability and award of the specific amounts. Rather, those monetary judgments were entered by the trial court incidental to those prior dismissals. Accordingly, we conclude that notices of appeal did not divest the trial court of jurisdiction to enter the monetary judgments.

## HEARING COSTS

Plaintiff contends that the Director's imposition of hearing costs pursuant to section 408(5) of the Code (215 ILCS 5/408(5) (West 2000)) was erroneous. As noted earlier, the hearing officers recommended

plaintiff pay $491,526.49 in hearing costs, which represented more than 98% of the hearing costs imposed. The Director subsequently reduced that amount to $289,122.54 based on partial payment made by the Department of the hearing costs recommended by the hearing officers.

■ Sections 408(5)(a) and (5)(b) of the Code state in relevant part:

"(5)(a) The costs incurred by the Department of Insurance in conducting any hearing authorized by law shall be assessed against the parties to the hearing in such proportion as the Director of Insurance may determine upon consideration of all relevant circumstances including: (1) the nature of the hearing; (2) whether the hearing was instigated by, or for the benefit of a particular party or parties; (3) whether there is a successful party on the merits of the proceeding; and (4) the relative levels of participation by the parties.

(b) For purposes of this subsection (5) costs incurred shall mean the hearing officer fees, court reporter fees, and travel expenses of Department of Insurance officers and employees ***." 215 ILCS 5/408(5)(a), (5)(b) (West 2000).

■ Plaintiff contends that it is exempt from the above hearing costs as a matter of law pursuant to section 6—16 of the Guaranty Law. Section 6—16 of the Guaranty Law states:

"Tax Exemptions. The Association is exempt from payment of all fees and all taxes levied by this State or any of its subdivisions, except taxes levied on real property." 215 ILCS 125/6—16 (West 2000).

Plaintiff contends that the "fees" exempted by section 6—16 of the Guaranty Law include the hearing costs imposed against it by the Director under section 408(5) of the Code. To support this contention, plaintiff emphasizes that section 408(5)(b) of the Code states that the hearing-related "costs" imposed under section 408(5)(a) mean, *inter alia*, "hearing officer fees."

■ We reject plaintiff's contention that section 6—16 of the Guaranty Law exempts it from paying the hearing costs assessed against it. Section 6—16 of the Guaranty Law is entitled "Tax Exemptions" and exempts plaintiff from "all fees and all taxes *levied* by this State *** except taxes levied on real property." (Emphasis added.) 215 ILCS 125/6—16 (West 2000). The focus of section 6—16 on "tax exemptions," its coupling of the terms "fees" and "taxes," and its use of the verb "levy" with respect to both fees and taxes reflect that the meaning of "fees" should be construed as comparable or similar to the meaning of "taxes." *Environmental Protection Agency v. Pollution Control Board*, 186 Ill. App. 3d 995, 999 (1989) (noting that under doctrine of *noscitur a sociis*, when two words or phrases of analogous

meaning are used together in a statutory provision, "they are understood to be used in their cognate sense, to express the same relations, and give color and expression to each other").

The exemption in section 6—16 of the Guaranty Law is limited to taxes and fees that are "levied" by the State of Illinois. " 'Levied' is defined as the formal and official action of a legislative body determining that a tax *** shall be imposed." *Peirce v. Conant*, 47 Ill. App. 2d 294, 308 (1964). Thus, when used as a verb and in the context of taxation, "levy" means to formally and officially determine that a tax shall be imposed. See *Peirce*, 47 Ill. App. 2d at 308. In addition, when used as a verb and in the context of taxation, levy means "to impose or collect by legal authority." Merriam-Webster's Collegiate Dictionary 669 (10th ed. 1996). Taxes are routinely collected, *i.e.*, levied, by the Department of Revenue initially in a nonadversarial context without any type of formal, litigation-related proceeding. Correspondingly, pursuant to the doctrine of *noscitur a sociis*, we conclude that the "fees *** levied" referred to in section 6—16 are to be interpreted similarly to taxes and are thus also initially subject to collection in a nonadversarial context without any type of formal, litigation-related proceeding. In contrast to the taxes and fees exempted under section 6—16 of the Guaranty Law, the "hearing costs" imposed in the instant case under section 408(5)(a) of the Code were not initially collected in a nonadversarial context without any type of formal litigation-related proceeding. Rather, these costs were assessed only after an adversarial proceeding had been initiated and an administrative hearing had been conducted. 215 ILCS 5/408(5)(a), (5)(b) (West 2000). The fees and taxes exempted under section 6—16 of the Guaranty Law are thus significantly different from the hearing costs assessed under section 408(5)(a) of the Code.

We note that the Guaranty Law does include a provision that eliminates plaintiff's exposure to certain types of liabilities arising from litigation and imposed after an adversarial proceeding has been conducted. Specifically section 6—8(9)(b) of the Guaranty Law states in relevant part that "[plaintiff] shall not be liable for punitive or exemplary damages." 215 ILCS 125/6—8(9)(b) (West 2000). This section reflects the legislature could have drafted a statutory provision eliminating plaintiff's exposure to hearing costs, including hearing officer fees (*i.e.*, exempting plaintiff from hearing officer fees), but chose not to do so. For the reasons previously discussed, we conclude that the "fees" exempted under section 6—16 of the Guaranty Law do not include hearing costs imposed under section 408(5)(a) of the Code and that plaintiff was thus not exempt as a matter of law from paying the hearing costs imposed by the Director in the instant action.

■ Plaintiff alternatively contends that even if section 6—16 of the Guaranty Law did not exempt it as a matter of law from the subject hearing costs, the Director's imposition of these costs pursuant to section 408(5) of the Code was improper. Section 408(5)(a) of the Code authorizes the Director to assess costs based upon consideration of a series of factors, including whether there was a successful party on the merits of the proceeding. 215 ILCS 5/408(5)(a) (West 2000). Plaintiff notes the Director based his imposition of hearing costs in part upon his conclusion that plaintiff "did not prevail" in the proceeding before him. Plaintiff, in turn, argues that "[t]o the extent that this court concludes *** that [plaintiff] should have prevailed in whole or in part on the merits, *** the basis for the Director's assessment of hearing costs against [plaintiff] has been modified or removed." Plaintiff's alternative hearing-costs argument thus presumes review by this court of the Director's underlying decision. We note, however, that application in the instant case of the previously discussed exhaustion of remedies doctrine precludes us from undertaking such a review. Moreover, the record reflects the hearing costs were properly imposed based upon the Director's consideration of all relevant factors. Based upon the foregoing discussion, we affirm the hearing costs assessed in the instant case.

## CROSS-APPEAL

Defendant-providers EHS Hospitals-Bethany Hospital, EHS Hospitals-Christ Hospital, and EHS Hospitals-South Chicago Community Hospital (collectively EHS or the EHS Hospitals) cross-appeal the amount of interest awarded by the trial court in judgments which it entered on April 24, 2002. By those judgments, the trial court awarded EHS its principal claims plus (a) prejudgment interest at the statutory rate of 5% *per annum* from April 22, 1994 (the date plaintiff denied EHS's payment requests), to February 27, 2001 (the date of Director Shapo's order); and (b) postjudgment interest at the statutory rate of 9% *per annum* after February 27, 2001. EHS contends in its brief on cross-appeal that it was entitled to prejudgment and postjudgment interest at a rate of 1.5% per month based upon a settlement and fee agreement it entered into with MedCare prior to MedCare's insolvency and based upon stipulations it entered into with plaintiff during the subsequent administrative proceedings.

Each of EHS's three notices of cross-appeal states that EHS "cross appeals only the part of the [j]udgment which found the rate of prejudgment interest to be the statutory rate of 5% per annum rather than a contractual rate of 1.5% per month which was requested by Defendant-Appellee." In addition, the three notices of cross-appeal

specify that EHS seeks "[e]ntry of an order: (a) reversing in part the April 24, 2002 [j]udgment to the extent that the judgment awarded pre-judgment interest at a rate of 5% per annum; (b) modifying the judgment to award pre-judgment interest at the rate of 1.5% per month; and (c) affirming the [j]udgment in all other respects." The notices of cross-appeal do not seek reversal or modification of the post-judgment interest awarded by the trial court.

## BACKGROUND

MedCare issued certificates of coverage to its enrollees which provided, among other things, that MedCare would pay medical care providers such as the EHS Hospitals their "reasonable and customary" fees and "standard" room rates for treatment rendered by those providers to MedCare enrollees. MedCare's certificates expressly contemplated that MedCare would enter into contracts with medical services providers. For example, a MedCare certificate included in the record states:

> "MedCare will provide through contractual arrangements with organizational entities or by payment of the other Usual and Customary Fees for which MedCare may be liable hereunder the Medical and Surgical Services, the Hospital Services and the other services and benefits specified in this Certificate."

In 1990, EHS filed a suit against MedCare seeking payment for services rendered at EHS facilities to certain MedCare enrollees. In order to resolve that suit, EHS and MedCare entered into a settlement and fee agreement (settlement agreement) in December 1991. The settlement agreement provided that MedCare would pay fixed amounts to resolve disputed charges for past services rendered by EHS to Med-Care enrollees. Attachments to the settlement agreement reflect that the disputed charges collectively represented over 650 days of unpaid hospitalization services provided by EHS. The settlement agreement provided that EHS would release MedCare from all claims for liability upon payment of the agreed amounts, established dates for the payment of those amounts, and provided that MedCare would pay interest at the rate of 1.5% per month if it failed to make those payments in accordance with those dates. The settlement agreement also established "all inclusive" fee rates that EHS would charge MedCare for medical services rendered to its enrollees for hospitalizations initiated on or before February 29, 1992. Plaintiff does not dispute EHS's assertion in its brief that these rates were discounted below the usual and customary fees charged by EHS. The settlement agreement expressly connected MedCare's obligations to pay EHS to MedCare's obligations under the certificates of coverage. For example, section 5 of the settlement agreement stated in relevant part:

"Medcare shall pay [EHS] the following all inclusive rates for charges for services of any type or sort whatsoever \*\*\* rendered by [EHS] \*\*\* in connection with services provided to the patients of [EHS] who are enrollees of MedCare at the time services are provided, for hospitalizations regardless of level or intensity of care, provided that \*\*\* the various terms and conditions set forth in MedCare's certificate of coverage have been met (including but not limited to those relating to medical necessity, eligibility, and notice)."

In addition to section 5, section 7 of the settlement agreement stated payments for future services would be due only if those services were rendered in accordance with MedCare's certificates of coverage. Finally, the settlement agreement provided that if MedCare failed to pay its bills within an average of 30 days, those bills would be subject to interest at the rate of 1.5% per month.

In January 1993, approximately one year after MedCare and EHS entered into the above settlement agreement, MedCare was found insolvent. In April 1994, plaintiff denied EHS's payment claims for services it had rendered to MedCare enrollees, and EHS in turn sought review of that denial by the Director of the Illinois Department of Insurance. The Director appointed hearing officers who concluded plaintiff could not take the "benefit" of the discounted fee schedule without also assuming the "burden" that went with it. After the hearing officers found plaintiff liable for MedCare's debts to the providers, plaintiff and EHS stipulated to the principal amounts for which plaintiff would be liable if the hearing officers' liability finding was ultimately upheld. The stipulated principal amounts were as follows:

| Party | Principal Amounts |
|---|---|
| EHS Hospitals-South Chicago Community Hospital | $658,672.45 |
| EHS Hospitals-Christ Hospital | $140,797.76 |
| EHS Hospitals-Bethany Hospital | $318,765.83. |

EHS and plaintiff also stipulated that if plaintiff was ultimately found liable for the above principal amounts, those amounts would be subject to a prejudgment interest rate of 1.5% per month. The stipulations preserved plaintiff's right to appeal the rulings of the hearing officers, including the award of prejudgment interest. The stipulated prejudgment interest amounts were as follows:

| Party | Prejudgment Interest Amounts |
|---|---|
| EHS Hospitals-South Chicago Community Hospital | $324.82 per day |
| EHS Hospitals-Christ Hospital | $69.43 per day |
| EHS Hospitals-Bethany Hospital | $157.20 per day. |

The hearing officers recommended that the Director award prejudgment interest to EHS based upon the above percentage of 1.5% per month. The hearing officers concluded the Association could not take the "benefit" of the discounted fee schedule in the settlement agreement without also assuming the "burden" that went with it. In support of this recommendation, the hearing officers explained:

> "The EHS Hospitals and MedCare HMO entered into an agreement to settle various payment disputes pursuant to which MedCare HMO agreed to pay, and EHS Hospitals agreed to accept, payments at a discount from the EHS Hospitals 'usual and customary' rates, and also providing for the payment of interest at the rate of 1.5% per month. The Guaranty Association accepted the benefit of the settlement agreement by calculating its liability to the EHS Hospitals using the discounted fees. It must also accept the burden of paying interest at the rate set forth in the settlement agreement."

The Director entered an order finding plaintiff liable to EHS for the stipulated amounts; however, he declined to award any interest, concluding that he lacked statutory authority to do so. EHS filed motions for rehearing which were denied by the Director.

EHS subsequently filed complaints for administrative review in the circuit court seeking reversal of the portion of the Director's order declining to award interest. Thereafter EHS moved for entry of a judgment granting prejudgment and postjudgment interest at the rate of 1.5% per month. The trial court denied the motion, explaining in part:

> "The key to this issue is what are the contractual obligations to which the legislature refers, contracts between insolvent HMOs and providers of medical services or contracts between insolvent HMOs and enrollees in such medical insurance programs. There are no Illinois decisions on this question.
>
> In reading the stated purpose as well as the other provision[s] of the statute, it is clear that the contracts involving HMOs and enrollees was [sic] the primary focus of the legislature. Moreover when one factors in that membership in the fund is a requirement of doing business in Illinois and that the Guaranty Fund is not a profit and loss type business, these insurance companies must have some assurance of their potential liabilities in order to make the decision to operate in Illinois. To do otherwise would subject these carriers to liabilities incurred for obligations by companies with no bargaining position, merely to stay in business for a week or month or a few years in hopes their financial situations would improve.
>
> Counsel argues that the stip—the contract was used for purposes

of a stipulation as to the amount [due]. That is an agreement entered between two parties. It's not binding on this court."

The trial court entered orders granting EHS prejudgment interest at the rate of 5%, the statutory rate specified in section 2 of the Illinois Interest Act (815 ILCS 205/2 (West 2000)), and postjudgment interest at the rate of 9%, the statutory rate specified in section 2—1303 of the Code of Civil Procedure (735 ILCS 5/2—1303 (West 2000)).

## ANALYSIS

EHS contends in its cross-appellate brief that the trial court erred by refusing to impose prejudgment and postjudgment interest at the rate of 1.5% per month. In support of that contention, EHS argues that plaintiff was required under the Guaranty Law to honor the interest provisions included in the settlement agreement and was not entitled to accept the benefits of the settlement agreement while avoiding its burdens.

▮ Before addressing the merits of EHS's arguments, we note that the notices of cross-appeal filed by EHS specify that EHS cross-appeals "only the part of the [j]udgment which found the rate of prejudgment interest to be the statutory rate of 5% per annum rather than a contractual rate of 1.5% per month which was requested by Defendant-Appellee." The notices of cross-appeal do not seek reversal or modification of the postjudgment interest awarded by the trial court. " 'It is well established that an appellate court has jurisdiction only of those matters which are raised in the notice of appeal.' " *Steinberg v. System Software Associates, Inc.*, 306 Ill. App. 3d 157, 166 (1999), quoting *Lewanski v. Lewanski*, 59 Ill. App. 3d 805, 815 (1978). "To that end, Illinois Supreme Court Rule 303 provides that the notice of appeal 'shall specify the judgment or part thereof *** appealed from and the relief sought from the reviewing court.' " *Steinberg*, 306 Ill. App. 3d at 166, quoting 155 Ill. 2d R. 303(b)(2). EHS's notices of cross-appeal state that appeal is taken only from the portion of the judgment awarding prejudgment interest and seek affirmation of the remainder of the judgment. Therefore, we lack jurisdiction to consider the argument raised in EHS's cross-appellate brief challenging the 9% rate of postjudgment interest imposed by the trial court. Accordingly, we resolve only the issue involving prejudgment interest.

▮ "[T]he decision to award prejudgment interest under section 2 of the Illinois Interest Act is within the circuit court's sound discretion and [its decision] will not be reversed absent an abuse of discretion." *LaGrange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 873 (2000). A party may receive prejudgment interest

only at the statutory rate unless there is "an express contract provision allowing interest at a specific rate." *Premiere Electrical Construction Co. v. American National Bank of Chicago*, 276 Ill. App. 3d 816, 829 (1995).

EHS contends that section 6—8(2)(b) of the Guaranty Law required plaintiff to satisfy MedCare's contractual obligation to pay for hospital services rendered on behalf of MedCare's enrollees and thus to pay the 1.5%-per-month rate specified in the settlement agreement.

In response to EHS's argument, plaintiff contends that "while [it] believes no interest should be awarded to the EHS hospitals, certainly there is no justification for awarding anything more than the statutory [interest] rates already imposed by the circuit court." In support of this contention, plaintiff does not argue that the settlement agreement was void, illegal, or otherwise unenforceable on its face. Rather, plaintiff argues that the settlement agreement did not provide a basis for imposing contractual interest against it and that EHS misreads section 6—8(2)(b) of the Guaranty Law.

"When construing a statute, our primary goal is to determine and give effect to the intent of the legislature." *Seasons-4, Inc. v. Hertz Corp.*, 338 Ill. App. 3d 565, 571 (2003). "Inquiries into legislative intent begin with the language of the statute, which is 'the most reliable indicator of the legislature's objectives in enacting a particular law.'" *Seasons-4*, 338 Ill. App. 3d at 571, quoting *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). "We must give statutory language its plain and ordinary meaning, and when the language is clear and unambiguous, we must apply the statute without resorting to additional aids of statutory construction." *Seasons-4*, 338 Ill. App. 3d at 571. "When construing a statute, we may consider 'the reason and necessity for the statute and the evils it was intended to remedy.'" *Seasons-4*, 338 Ill. App. 3d at 571, quoting *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 309 (2001).

Section 6—8(2)(b) of the Guaranty Law states in relevant part that plaintiff shall "assure payment of the contractual obligations of the insolvent organization to covered persons." 215 ILCS 125/6—8(2)(b) (West 2000). "Covered person" means "any enrollee who is entitled to the protection of the Association." 215 ILCS 125/6—5(4) (West 2000). A "contractual obligation" means "any obligation of the [insolvent HMO] under covered health care plan certificates." 215 ILCS 125/6—5(3) (West 2000). A "covered health care plan certificate" means "any health care certificate, contract or other evidence of cover-

age within the scope of this Article under Section 6—3." 215 ILCS 125/6—5(5) (West 2000).

The plain language of section 6—8(2)(b) and the accompanying statutory definitions unambiguously indicates plaintiff was required to satisfy obligations which MedCare owed to enrollees under contracts or health care certificates extending coverage to those enrollees. Thus, determination of the extent of plaintiff's obligations under section 6—8(2)(b) requires examination of the written certificates of coverage issued by MedCare to its enrollees. Those certificates required Med-Care to "provide through contractual arrangements with organizational entities or by payment of other Usual and Customary Fees *** the Hospital Services and other services and benefits specified in this Certificate." The settlement agreement that MedCare entered into with EHS constituted a contractual arrangement pursuant to which MedCare agreed to pay certain fees for services rendered and to be rendered on behalf of MedCare enrollees. MedCare entered into the settlement agreement in part to satisfy its obligations to its enrollees under the certificates. MedCare agreed to the interest provision in question in the instant case in an effort to settle past payment claims and secure fixed future payment schedules in order to benefit itself and its enrollees.

Plaintiff contends that the express language of section 6—8(2)(b) "limits [its] obligations to the contractual obligations of the insolvent organization to *covered persons*, which are defined as enrollees, not health care providers." This language, plaintiff reasons, shows that "[plaintiff's] purpose is to assure payment of obligations under covered health care plan certificates of MedCare to its enrollees, not contracts between MedCare and its health care providers."

We agree with plaintiff that section 6—8(2)(b) requires it to satisfy the obligations owed by MedCare to its enrollees. As previously noted, the coverage certificates imposed an obligation on MedCare to its enrollees to "provide through contractual arrangements with organizational entities or by payment of other Usual and Customary Fees *** the Hospital Services and other services and benefits specified in this Certificate." The interest provision in the settlement agreement directly related to MedCare's obligation under the certificates to provide hospital and related services to its enrollees through contractual arrangements or by payment of fees. We conclude that the interest provision did qualify as a "contractual obligation" of MedCare to "covered persons" under section 6—8(2)(b) and as an obligation with which plaintiff was required to comply.

In support of its contention that it had no obligation to pay inter-

est at the rate specified in the settlement agreement, plaintiff cites section 6—8(3) of the Guaranty Law.

■ Section 6—8(3) of the Guaranty Law states:

"There shall be no liability on the part of and no cause of action shall arise against the Association or against any transferee from the Association in connection with the transfer by reinsurance or otherwise of all or any part of an impaired or insolvent organization's business by reason of any action taken or any failure to take any action by the impaired or insolvent organization at any time." 215 ILCS 125/6—8(3) (West 2000).

Section 6—8(3) of the Guaranty Law does not create a limitless exception to liability. Rather, its plain language states that the Association shall not be liable in matters arising "in connection with the transfer *** of an impaired or insolvent's business." Plaintiff does not contend, and the record does not reflect, that the basis for EHS's interest claim arose in connection with the transfer of MedCare's business. Accordingly, we reject plaintiff's contention that section 6—8(3) relieved it of the obligation to pay interest at the rate specified in the settlement agreement.

■ Plaintiff asserts in its brief that while EHS's principal claims total approximately $1.1 million, the amount of prejudgment interest sought by EHS totals more than $1.6 million. We note, however, that plaintiff has not disputed the underlying fairness of the settlement agreement entered into between MedCare and EHS or suggested that its terms were in any way unconscionable. Indeed, as recognized by the hearing officers in their recommendation to the Director, plaintiff benefitted from the settlement agreement to the extent that it provided EHS would release MedCare from liability for the fees it initially claimed for services rendered to MedCare enrollees and accept payment from MedCare at discounted rates. Specifically, the settlement agreement resolved over 100 disputed hospitalizations that represented over 650 days of hospital care. Furthermore, the settlement agreement benefitted plaintiff to the extent that it provided MedCare with a discounted fee schedule from EHS for certain future hospital admissions. Plaintiff calculated the stipulated principal amounts in the instant case based upon the reduced discounted rates provided under the settlement agreement. In light of these benefits, plaintiff must also accept the burden of paying interest at the rate set forth in the settlement agreement and agreed to by MedCare in exchange for the discounted rates. See *H.G. Prizant & Co. v. Gust K. Newberg Construction Co.*, 12 Ill. App. 3d 1080, 1087 (1973) (a party may not accept the benefits of a contract while attempting to avoid its burdens).

Plaintiff's alternative argument is that EHS is not entitled to interest because the final orders were erroneous as a matter of law on the merits. Plaintiff's argument implicates consideration of the merits of the Director's underlying decision finding it liable for the principal amounts to EHS. The application of the previously discussed exhaustion of remedies doctrine makes such consideration unnecessary. Accordingly, based upon the previous discussion, we conclude that the trial court's refusal to impose prejudgment interest at a rate of 1.5% per month as provided by the settlement agreement constituted an abuse of discretion.

## CONCLUSION

For the foregoing reasons, regarding the direct appeal, we affirm the trial court's dismissals of plaintiff's complaints for administrative review. We affirm the trial court's judgments on the principal amounts and hearing costs and its imposition of postjudgment interest. We affirm its imposition of prejudgment interest in favor of the subject providers except for EHS Hospitals.

With respect to the cross-appeal, we vacate the trial court's imposition of prejudgment interest on behalf of cross-appellants EHS Hospitals, remand the case to the trial court, and direct the trial court to recalculate the amount of prejudgment interest owed to cross-appellants EHS Hospitals in accordance with the percentage rate of 1.5% per month included in the above-discussed settlement agreement.

The motion filed by Loyola University Medical Center, University of Chicago Hospitals, and EHS Hospitals to strike portions of plaintiff's brief on appeal and the motion filed by EHS Hospitals to strike portions of plaintiff's brief on cross-appeal are denied.

Affirmed in part and vacated in part; cause remanded.

FITZGERALD SMITH, P.J., and GALLAGHER, J., concur.